**Noel Puente GOMEZ; Lee Mazur Hays; Bob Jones; Alfredo Roman; Patrick Hall; Marq Bartlett; Gregory Joseph Nelson, Plaintiffs–Appellees,**

v.

**Richard A. VERNON, Director, Idaho Department Of Corrections; Dave Paskett, Warden, Idaho State Correctional Institution; James C. Spalding, Director, IDOC; Joe Klauser, Warden, ISCI; Defendants–Appellants,**

---

Alan Lee Brandt, Defendant–
Intervenor–Appellant,

v.

Eugene Starr; Richard Carl; Bobby
Rowell; Alfredo Esparza, Plain-
tiffs–Intervenors–Appellees.

No. 99–35930.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 14, 2001

Filed July 10, 2001

Timothy D. Wilson, Office of Attorney General, State of Idaho, Boise, Idaho for the defendants-appellants.

Stephen L. Pevar (argued), American Civil Liberties Union, Denver, Colorado; Margaret Winter, Donna H. Lee, and Eric Balaban, National Prison Project of the ACLU Foundation Inc., Washington, D.C.; Howard Belodoff, Boise, Idaho, for the plaintiffs-appellees.

Before: M. Margaret McKeown, Kim McLane Wardlaw, and Ronald M. Gould, Circuit Judges.

McKEOWN, Circuit Judge:

This case exemplifies antagonism toward prisoner litigation at the cost of constitutional rights and legal ethics. While all may be fair in war,[1] such is not the case in the judicial arena—the courtroom is not a battlefield. After a nineteen-day trial, the district court, Magistrate Judge Boyle presiding, found that the Idaho Department of Corrections, two of its penal institutions, and several officials (collectively the "Department") retaliated against inmates who filed lawsuits or availed themselves of grievance procedures. The conclusion that the Department violated the inmates' constitutional rights is not challenged on appeal. Rather, we are called upon to address whether, for purposes of jurisdiction, the parties consented to appear before the magistrate judge; whether the grant of injunctive relief was an appropriate remedy for the retaliation; and whether a court may impose sanctions under its inherent power and 28 U.S.C. § 1927 when counsel[2] for the state improperly acquired and used privileged and confidential litigation materials belonging to inmate litigants. We answer these questions in the affirmative, and we affirm.

## BACKGROUND

### Factual Background.[3]

■ The Department, like many prison systems, employs inmates as law clerks in its prison libraries to help other inmates file legal papers, such as habeas corpus petitions or civil rights claims, and to prepare grievances or other administrative complaints. Inmates enjoy access to the law libraries, and the assistance of the inmate law clerks, as a guarantee of their due process right to access to the courts. *See Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (holding that " 'the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law' ").

In the Idaho prison system, however, access to the assistance of law clerks and the libraries was not necessarily a risk-free proposition. For example, inmate preparation of legal documents and prosecution of legal activities became a basis for retaliation against inmate clerks. In 1985, Lee Hays worked as an inmate law clerk at the Idaho Correctional Institute–Orofino (ICI–O). In that role, he assisted fellow male inmates in filing habeas corpus petitions and civil rights claims against the prison and various prison personnel. This attracted the attention of the prison staff, who, in the presence of the warden, instructed Hays to stop. After Hays filed more suits, the warden arranged for him to be transferred to the Idaho State Correctional Institution (ISCI) in Boise. Although Hays was supposedly transferred for a rule infraction—interacting with female inmates—that reason was pretextual. He trained female law clerks as part of his law clerk duties and did so only on instruc-

---

1. "All's fair in love and war." Francis Smedly, Frank Fairleigh (1850); "The rules of fair play do not apply in love and war." John Lyly, Euphues (1578).

2. Counsel representing the Department on appeal was not involved in the misconduct or sanctions at issue in this appeal.

3. This factual summary is drawn from the district court's extensive findings of fact, which are not challenged on appeal, and which accompany the Memorandum Decision and Order and the Memorandum Decision and Order Relating to Plaintiffs' Motion for Sanctions.

tions and under supervision of a corrections lieutenant.

Similar consequences befell other inmates who took legal action. In 1987, inmate Patrick Hall filed multiple civil rights claims against the Department on behalf of other inmates. Hall subsequently lost his job in the ISCI law library, purportedly because he only offered legal help in exchange for a share of any damages award—a charge that was unsubstantiated. In 1993, an ISCI Disciplinary Hearing Officer threatened to confine and discipline another inmate, Wayne Olds, if in line with his standard duties as a law clerk, he helped an inmate prepare for a disciplinary hearing. Olds was later transferred from ISCI to ICI–O in retaliation for the number of "concern forms" and grievances he filed, together with his persistence in prosecuting a federal civil rights case. Two years later, inmates Thomas Sanger and Carl Shively were fired from their janitorial jobs in retaliation for signing affidavits used in litigation against the Department. And Idaho Maximum Security Institution (IMSI) officials intimidated inmate Michael McDonald for filing a grievance against an officer, forcing him to withdraw his grievance and to plead guilty to a disciplinary infraction. This series of retaliatory acts all stemmed from the inmates' constitutionally protected efforts to access the courts and the grievance process.

The operation and condition of the inmate law libraries and related complaints also became an issue in the Idaho prison system. Inmate Alfredo Roman, who worked as a law clerk in the IMSI library, kept a logbook documenting what he perceived as operational problems. One such problem was a corrections officer's habit of reading the inmates' legal documents. Roman took his concerns and his logbook to the law library supervisor, Corrections Officer Michelle Nelson. Ms. Nelson responded by removing Roman from his library job and placing him under investigation for keeping his logbook (which she considered "non-legal materials") in the law library. He eventually received two disciplinary citations.

Similarly, in 1997, inmate Bob Jones, a law clerk at the ISCI law library, confronted Nelson with his concerns about management of the law library. As a result, Nelson repeatedly attempted to have Jones transferred, first to ICI–O, and then to a prison facility in Louisiana. Finally, Jones resigned his job at the law library to avoid a transfer.

Deputy Warden George Miller took over supervision of the ISCI law library in November 1998. Although he was aware that the library needed at least six inmate law clerks to facilitate minimal access to the court system, he reduced the staff to four and at times allowed it to drop to two. Miller knew that the number of law clerks working in the library fell below what was minimally adequate. The district court found that the reduction in law clerks "was substantially motivated by a desire to prevent inmates' access to the court system."

No officer or employee of the Department was ever investigated or disciplined for retaliatory action, despite the wardens' knowledge of the complaints.

Plaintiff-appellees, inmates in the Idaho corrections system, brought this suit for damages and injunctive relief as a class action on behalf of themselves and other inmates. They worked on the case themselves, and were represented by outside counsel, with whom they corresponded in writing. As it turned out, the confidentiality of that correspondence was somewhat illusory. The inmates kept their written materials, including notes, research, and correspondence with their attorney, in two three-ring binders marked "*Gomez*"—the name of this lawsuit. In order to protect

those materials and to maintain their confidentiality, the inmates stored the binders in a restricted-access section of the ISCI law library. If an inmate who worked on the case needed to read or use the file, a request would be made to the librarian, who would retrieve the file and check it out to that individual. The district court found that "the inmates could not have done anything more to secure the confidentiality of these documents because there are no areas in the prison that are accessible only to inmates."

The clearly-marked file, at some point, attracted the attention of a prison employee, who in February 1997 made a copy of a letter from the inmates' counsel to nine inmates. The employee, who found the letter lying face-up on the law library desk of an inmate law librarian, gave the copy to the Department's lead counsel in this case, a Deputy Attorney General for the State of Idaho. The letter contained a summary of the strengths of the inmates' claims. Department's lead counsel kept the letter, and did not notify opposing counsel, the court, or her superiors that it was in her possession. It remained in her desk "in-box" for the next eight months.

That was only the beginning of the trail of documents from the prison library to Department's lead counsel's office. Four months later, another ISCI employee who worked in the law library noticed, as he checked the *Gomez* binders out to an inmate, that the binders contained documents related to this litigation. He understood the significance of the case because he had previously worked on this very lawsuit as a paralegal for the Department, and recognized documents in the binder he had worked on in that capacity. The official contacted the Department's lead counsel and told her that some documents indi-

cated that the inmates' outside counsel may have misled the magistrate judge during an earlier hearing with regard to whether inmates had suffered physical injury in retaliation for litigation. The Department's lead counsel told the prison official to copy the documents and deliver them to her, which he did. Counsel did not inform the court, the inmates, or their attorney about the document disclosure.

The Department's lead counsel reviewed the materials, dividing them into four categories, one of which consisted of documents she suspected were privileged.[4] The next day she contacted her co-counsel, who was also her supervisor, and they read several of the documents. In their view, some of the letters demonstrated that the inmates' lawyer was defrauding the court. Believing that they had come across evidence of fraud or contempt of court, lead counsel continued to acquire other documents from the inmates' *Gomez* file. Neither she nor her co-counsel informed opposing counsel that they had seen the correspondence or other documents. Over the course of the next five months, Department counsel received ten additional copies of documents from prison employees.

Some four months after speaking to lead counsel about the letters, and eight months after lead counsel had first acquired documents, co-counsel decided to seek advice. He consulted with his supervisor, who in turn approached an official at the Idaho State Bar. The bar official and the supervisor advised co-counsel not to read any more documents and to turn over to the court those documents that were in his possession. Nonetheless, both the lead counsel and her co-counsel, Idaho Deputy Attorneys General, continued to receive

---

4. Despite her recognition that privilege might apply, she reasoned that any privilege was waived by virtue of the documents' location— a section of the law library easily accessible to prison employees.

and read case-related documents given to them by the prison employee, justifying the continued receipt of documents on the ground that the materials were "similar to what had already been given to [them]."

Subsequently, the Department filed a motion for an order to show cause why inmates' counsel should not be held in contempt of court, based on copies of the correspondence between the inmates and their lawyer. The documents purportedly showed that physical injury to inmates was not as extensive as inmates' counsel had represented to the court in an earlier hearing. The court denied that motion, concluding that the representations of inmates' counsel were well within the realm of acceptable argument and did not constitute a fraud.

**Trial and Findings.**

After a nineteen-day bench trial, followed by a lengthy series of evidentiary rulings, hearings, and various motions over the next several months, the district court issued findings of fact and conclusions of law in the underlying case. The court found the facts summarized above, including repeated instances of retaliatory conduct. Significantly, the court found that an investigation to determine whether illegal retaliation had occurred was not conducted even though prison administrators were faced with allegations clearly indicating that correctional officers had violated IDOC [Idaho Department of Corrections] policy and conducted reprisals against an inmate who attempted to seek relief through established ... procedures. The court granted a declaratory judgment that the inmates were subjected to instances of unlawful retaliation but denied class-wide prospective injunctive relief. The court granted individual injunctive relief to six specified inmates.

**Sanctions Order.**

The inmates moved for an order to show cause why Department counsel should not be sanctioned for their conduct in reading, using, and failing to disclose their access to the *Gomez* files. After a three-day hearing, the court awarded sanctions of $4,500 ($3,500 in attorneys' fees and $1,000 for costs and expenses) under the court's inherent power and 28 U.S.C. § 1927. The court found that Department counsel had acquired materials that are confidential and protected by the attorney-client privilege. In addition, the court found that counsel had implicitly authorized and encouraged prison employees "to secretly search for, inspect, examine, read, copy and then deliver ... confidential attorney-client correspondence or documents" over a nine-month period. The court held that Department counsel completely disregarded the attorney-client privilege and ignored their individual ethical duty to submit the materials to the court. The court found, as a factual matter, that counsel's actions in acquiring and using the materials and in moving for contempt created unnecessary litigation. Finally, the court concluded that the state attorneys' "breach[ ][of] the attorney-client privilege, as well as compromising the confidential communications flowing from the legal representatives ... constituted bad faith conduct and warrants the imposition of sanctions."

### ANALYSIS

### I. Consent to Appear Before the Magistrate Judge

We first address the threshold jurisdictional question of whether all parties consented to trial before the magistrate judge. Specifically, the Department argues that the magistrate judge was without authority to order judgment because IMSI Warden Dave Paskett had not consented, in his

official capacity, to appear before the magistrate.

A magistrate judge may conduct civil proceedings and order the entry of judgment only if the magistrate judge has been "specially designated to exercise such jurisdiction by the district court," 28 U.S.C. § 636(c)(1), and all parties clearly and unambiguously consent, Fed.R.Civ.P. 73(b); *Hajek v. Burlington N. R.R.*, 186 F.3d 1105, 1108 (9th Cir.1999). Because the district court designated the magistrate judge to hear this case, the issue we must resolve is whether Warden Paskett consented. The consent of the other parties is not at issue.

■■■ Section 636(c) "does not specify the precise form or timing of the parties' consent." *Kofoed v. Int'l Bhd. of Elec. Workers, Local 48*, 237 F.3d 1001, 1004 (9th Cir.2001). It is well settled that written consent authorizes a magistrate judge to enter judgment. *See Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir.1999). Absent such consent, however, the magistrate judge lacks jurisdiction, and any judgment entered is a nullity, which we have no jurisdiction to review. *See Aldrich v. Bowen*, 130 F.3d 1364, 1365 (9th Cir.1997) (noting that the "record contain[ed] no written evidence"); *Estate of Conners v. O'Connor*, 6 F.3d 656, 658 (9th Cir.1993) (holding that a magistrate judge's judgment without consent is a nullity).

■■ Review of the record before us leaves little doubt that all parties consented to proceed before the magistrate judge. The original complaint named not only the Department but Paskett in his capacity as warden of ISCI. All counsel filed a written "Consent to Proceed Before a United States Magistrate." During the course of the litigation, Paskett became warden of IMSI and Joe Klauser succeeded him as warden of ISCI. Before trial, the inmates' counsel sought to amend their complaint

to, among other things, substitute the appropriate defendants. In a pretrial statement, counsel for the Department declared that the Department did not object to the substitution: "Defendants do stipulate to charging the named Defendants." In that same document, the Department stated: "[the] parties have already agreed to trial of this case before United States Magistrate Judge Larry M. Boyle." Read together, these clear and unambiguous stipulations in the pretrial statement constitute consent to proceed before the magistrate judge. *See, e.g., General Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1495 (11th Cir.1997) (consent to trial before magistrate was clearly expressed, even though the stipulation did not list all defendants, but all defendants were present at the status conference and their attorney signed the stipulation). Accordingly, the magistrate judge had jurisdiction to enter judgment, and we have jurisdiction to entertain this appeal.

## II. Retaliation

### A. Causal Nexus

The district court's 36–page order, which includes extensive findings of fact, is a model of clarity and detail. The Department does not challenge the factual findings; nor, with the exception of Jones, *infra* section II.B, does it dispute the district court's legal conclusion that the inmates suffered retaliation for the exercise of their First Amendment rights. Rather, the Department argues, as a matter of law, that the findings do not establish a causal link between the official policy or custom of the prison administrators and the retaliatory acts of the individual prison officials.

■■ A suit, like this one, against a governmental officer in his official capacity is equivalent to a suit against the governmental entity itself. *McRorie v. Shimoda*, 795 F.2d 780, 783 (9th Cir.1986). Thus,

the Department administrators are liable in their official capacities only if policy or custom played a part in the violation of federal law. *Larez v. City of Los Angeles,* 946 F.2d 630, 646 (9th Cir.1991); *McRorie,* 795 F.2d at 783.

A policy or custom may be found either in an affirmative proclamation of policy or in the failure of an official "to take any remedial steps after the violations." *Larez,* 946 F.2d at 647; *see also McRorie,* 795 F.2d at 784 (custom inferred from failure to reprimand or discharge); *Grandstaff v. City of Borger, Texas,* 767 F.2d 161, 171 (5th Cir.1985) ("[S]ubsequent acceptance of dangerous recklessness by policymaker tends to prove his preexisting disposition and policy."). For example, in *Larez,* we held that the Chief of Police would be liable if "it was almost impossible for a police officer to suffer discipline as a result of a complaint lodged by a citizen." *Larez,* 946 F.2d at 647 (internal citation omitted).

■ The Department argues that the policy-making official is liable only if he directly ordered the retaliation in question. Where the retaliatory acts are traceable to a custom or policy, however, it is unnecessary to demonstrate that the decision-making official directly ordered each act carried out under his edict. A custom or policy establishes a general rule of behavior, which is to be followed in a variety of circumstances, and even in the absence of the policy-maker. *See Larez,* 946 F.2d at 647. Moreover, a policy-maker's pronouncement that he has not or will not discipline officers that retaliated against prison litigators is sufficient evidence of a policy · or custom: those statements can "be[ ] considered to represent [the prison's] policy or custom of condonation of, and acquiescence in, [retaliation] by its offic[ials]." *Id.*

■ The findings of fact detail the top administrators' failure to investigate the retaliation complaints, the lack of repri-

mand or discipline for the officers involved even when their supervisors were aware of the complaints, and the delegation of investigation to officers involved in the grievances. This turn a-blind-eye approach does not insulate the Department. On the contrary, ·the findings are more than sufficient to support the conclusion that the retaliatory acts were condoned by the officials, sufficient to "ma[k]e clear to officers that ... they could get away with anything." *Id.* The Department's failure to investigate or correct constitutional violations supports the district court's finding that there was a policy or custom that led to violation of the inmates' rights.

### B. Harm to Bob Jones

■ The Department also contends that the repeated but ultimately unsuccessful attempts to transfer inmate Jones are not retaliatory as a matter of law because the transfers never took place. The reality is that in the face of repeated threats of transfer because of his complaints about the administration of the library, Jones eventually quit his law library job. According to the findings, Jones' complaints—protected by the First Amendment—related to "how [the law library] was affecting the inmates' right to access the courts." As we observed in *Hines v. Gomez,* 108 F.3d 265 (9th Cir. 1997), a retaliation claim may assert an injury no more tangible than a chilling effect on First Amendment rights. *Id.* at 269 (noting that "this court has reaffirmed that prisoners ·may still base retaliation claims on harms that would not raise due process concerns"); *cf. Resnick v. Hayes,* 213 F.3d 443, 449 (9th Cir.2000) (without alleging a chilling effect, a retaliation claim without allegation of other harm is not actionable). It is the chilling effect that forced Jones to quit his job, not a generalized harassment claim. Therefore, the district court did not err in finding, as a matter of law, that the Department retali-

ated against Jones, in violation of his First Amendment rights.

## III. Injunctive Relief

The injunctive relief entered in this case was very narrow and targeted at six specific individuals. Class-wide prospective injunctive relief was denied. The district court went to great lengths to discuss the legal parameters for injunctive relief, the constitutional limitations on court decrees directed to prison administrators, the requirements of the Prison Litigation Reform Act, and the importance of remedying unconstitutional conduct. As the court explained,

> in determining the appropriateness of relief in the instant action, the Court has considered when relief is appropriate, how relief must be tailored when conditions of prison confinement are challenged and the Court's role in protecting and preserving federally guaranteed rights.

Despite this careful tailoring, the Department argues that the injunctive relief was granted in error because the district court misapplied the standard for irreparable injury and failed to properly limit the injunction's scope.

In general, injunctive relief is "to be used sparingly, and only in a clear and plain case." *See Rizzo v. Goode,* 423 U.S. 362, 378, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) (internal quotation omitted). "A district court's grant of permanent injunctive relief is reviewed for an abuse of discretion or application of erroneous legal standards." *Planned Parenthood of S. Ariz. v. Lawall,* 180 F.3d 1022, 1027 (9th Cir.1999) (citing *Easyriders Freedom F.I.G.H.T. v. Hannigan,* 92 F.3d 1486, 1493 (9th Cir.1996)). When a government agency is involved, we must, in addition, observe the requirement that the government be granted the "widest latitude in the dispatch of its own internal affairs." *Rizzo,* 423 U.S. at 378–79, 96 S.Ct. 598 (citations omitted); *see also Lewis v. Casey,* 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("[I]t is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution."). When a state agency is involved, these considerations are, if anything, strengthened because of federalism concerns. *See O'Shea v. Littleton,* 414 U.S. 488, 499, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ("proper balance in the concurrent operation of federal and state courts counsels restraint against the issuance of injunctions against state officers"). Accordingly, injunctive relief is appropriate only when "irreparable injury" is threatened, *City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), and any injunctive relief awarded must avoid unnecessary disruption to the state agency's "normal course of proceeding," *O'Shea,* 414 U.S. at 501, 94 S.Ct. 669.

This well-established standard for injunctive relief must also be viewed in conjunction with the requirements of the Prison Litigation Reform Act, 18 U.S.C. § 3626 ("PLRA").[5] Under the PLRA, the

---

**5.** The PLRA provides, in relevant part:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A). Because this is a "civil proceeding arising under Federal law with respect to ... the effects of actions by

court must find that the prospective relief is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right," before granting injunctive relief. 18 U.S.C. § 3626(a)(1). Accordingly, "before granting prospective injunctive relief, the trial court must make the findings mandated by the PLRA [and must] give 'substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.'" *See Oluwa v. Gomez,* 133 F.3d 1237, 1239 (9th Cir.1998) (quoting 18 U.S.C. § 3626(a)(1)) (holding that Congress explicitly prescribed section 3626's reach to include pending cases).

▮▮▮ Although the PLRA significantly affects the type of prospective injunctive relief that may be awarded, it has not substantially changed the threshold findings and standards required to justify an injunction. To this extent, we agree with the Sixth Circuit that "the [PLRA] merely codifies existing law and does not change the standards for determining whether to grant an injunction." *Smith v. Ark. Dep't of Corr.,* 103 F.3d 637, 647 (8th Cir.1996).

## A. Irreparable Injury

To satisfy the requirement of irreparable injury, a plaintiff must demonstrate a "real or immediate threat that the[y] will be wronged again—a 'likelihood of substantial and immediate irreparable injury.'" *Lyons,* 461 U.S. at 111, 103 S.Ct. 1660 (quoting *O'Shea,* 414 U.S. at 502, 94 S.Ct. 669); *see also Lewis,* 518 U.S. at 349, 116 S.Ct. 2174 (courts limited to "provid[ing] relief to claimants, in individual or

class actions, who have suffered, or will imminently suffer, actual harm"). "A state law enforcement agency may be enjoined from committing constitutional violations where there is proof that officers within the agency have engaged in a persistent pattern of misconduct." *Thomas v. County of Los Angeles,* 978 F.2d 504, 508 (9th Cir.1992). *See also Walters v. Reno,* 145 F.3d 1032, 1048 (9th Cir.1998) ("Injunctive relief is appropriate in cases involving challenges to government policies resulting in a pattern of constitutional violations.").

▮▮▮ The record demonstrates that continued retaliation for inmates' exercise of their constitutional rights is a real threat. As found by the district court, the inmates have proven that the Department retaliated against them for exercising their right to access the courts on a number of occasions spanning a decade, and that the retaliation was pursuant to a custom or policy. Despite supervisors' knowledge of this pattern, no investigation, no discipline, and no corrective action followed. Now the Department claims that its employees will not retaliate again. The district court, however, found little comfort in that proclamation because no policy or mechanism is in place to back up that promise.[6] *Cf. United States v. Odessa Union Warehouse Co-op,* 833 F.2d 172, 176 (9th Cir.1987) ("Courts must beware of attempts to forestall injunctions through remedial efforts and promises of reform that seem timed to anticipate legal action, especially when there is the likelihood of recurrence."). The court concluded that some relief is necessary to prevent future retaliatory transfers and to expunge the records of

government officials on the lives of persons confined in prison," it is a prison conditions case for purposes of the PLRA. 18 U.S.C. § 3626(g)(2).

**6.** The district court noted "that [Department] officials testified at trial that they have not

created a rule which prohibits individual officers from improperly asserting influence upon a transfer coordinator in order to include a burdensome and litigious inmate on the list of inmates that are to be transferred."

references based on retaliatory action. Implicit in these rulings is a determination that, absent the injunction, the likely harm would be irreparable.

## B. Scope of Injunction

■■ Having concluded that the circumstances justify injunctive relief, we must next determine whether the relief granted was properly tailored. *See Lewis*, 518 U.S. at 360, 116 S.Ct. 2174 ("The scope of injunctive relief is dictated by the extent of the violation established") (internal quotation omitted). Accordingly, we must consider whether the court's "exercise of equitable discretion ... heel[s] close to the identified violation and respect[s] the interests of state and local authorities in managing their own affairs, consistent with the Constitution," *Gilmore v. People of the State of California*, 220 F.3d 987, 1005 (9th Cir.2000) (citation and internal quotation marks omitted), and, in the language of the PLRA, whether it "extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1). We hold that the relief was appropriately tailored, and is the least intrusive means to correct the violation. Thus, the district court did not abuse its discretion.

The district court properly limited its injunction to a combination of prospective and retrospective relief granted to just six inmates, denying class-wide injunctive relief. Three inmates received retrospective relief—certain references were expunged from Roman's Disciplinary Offense Report; and Sanger and Shively were restored to janitorial employment at their pre-retaliation pay level, and all retaliatory disciplinary references were cleared from their institutional files. Because the retrospective relief does not raise the same federalism concerns as a court's ongoing supervision in a prison's affairs, and be-

cause it was limited to remedying the prison's retaliatory acts, such relief passes constitutional muster. *See Lewis*, 518 U.S. at 357, 116 S.Ct. 2174.

Five inmates received prospective relief. The district court enjoined the Department from adversely affecting Sanger's and Shively's pay level and employment because of this lawsuit. The judge also required the Department to ensure that any decision to transfer inmates Hays, Jones, and Olds satisfied objective criteria, was not influenced by individual officers who might be the subject of a lawsuit or grievance, and was not taken as a result of the inmates' exercise of their federally guaranteed rights. None of these remedies requires the continuous supervision of the court, nor do they require judicial interference in the running of the prison system. *Cf. Rizzo*, 423 U.S. at 369, 96 S.Ct. 598; *O'Shea*, 414 U.S. at 493, 94 S.Ct. 669 (reversing injunction requiring district court to scrutinize county's criminal justice system to ensure state court officials did not deprive the plaintiff class of their constitutional rights); *Lyons*, 461 U.S. at 100, 103 S.Ct. 1660 (reversing city-wide injunction preventing police use of choke-holds, and requiring regular officer training and record keeping). Indeed, the magistrate judge declared that he had "no intention of overseeing prison inmate transfer operations to the extent requested by Plaintiffs." And, as required by the PLRA, the prospective relief focused specifically on those few actions necessary to correct violations of individual inmates' rights.

In sum, the relief granted addressed only the harm caused each individual inmate. It did not apply to the prison system as a whole, or even to classes of prisoners. At most, the injunction affects a few isolated decisions over the course of these inmates' sentences. In the face of

page after page of findings with regard to violation of the inmates' constitutional rights, the narrow injunction can only be characterized as minimal and virtually non-intrusive. Accordingly, the court did not abuse its discretion in granting such narrowly drawn injunctive relief.

## IV. Sanctions

This case presents the remarkable circumstance where counsel for the state received, read, and used bootlegged copies of legal correspondence between inmates and their lawyer. The district court imposed sanctions against defense counsel—under both its inherent power and its statutory authority pursuant to 28 U.S.C. § 1927—for this misconduct. At issue are, as the court put it, sanctions for counsel's "secretly acquiring, reading, retaining, sharing [privileged] information ... and using information for potential tactical advantage ...." Although this is strong language, the record amply supports the court's findings and conclusions that the documents were privileged, that counsel violated the privilege and their ethical duty, and that sanctions were justified.

We address first the question of privilege, and next whether sanctions were warranted under the court's inherent power and 28 U.S.C. § 1927.

## A. Attorney–Client Privilege

 Federal common law recognizes a privilege for communications between client and attorney for the purpose of obtaining legal advice, provided such communications were intended to be confidential. *See generally* WEINSTEIN'S FEDERAL EVIDENCE, Chp. 503. The attorney-client privilege has been recognized as "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Practicing attorneys recognize the importance of the privilege and the safe harbor that it provides to encourage "full and frank communication between attorneys and their clients and thereby promote broader public interest in the observance of law and administration of justice." *Id.*

 Both the Supreme Court and this court have underscored the importance of the privilege, even where an attorney seeks to invoke the crime-fraud exception: [7]

> [U]nder *United States v. Zolin*, 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989), the district court could not consider the contents of a privileged letter in assessing the government's prima facie case until the government had, as a threshold matter, presented nonprivileged evidence "sufficient to support a reasonable belief that *in camera* review may yield evidence that establishes the exception's applicability."

*United States v. de la Jara*, 973 F.2d 746, 748 (9th Cir.1992).

 The privilege, however, is not absolute. The privilege may be waived by the client either implicitly, by placing privileged matters in controversy, or explicitly, by turning over privileged documents. Inadvertent disclosure can also result in a waiver of the privilege. *See Weil v. Investment/Indicators*, 647 F.2d 18, 24 n. 11 (9th Cir.1981). But, as we have held, when there has been an involuntary disclosure, the privilege will be "preserved if the privilege holder has made efforts 'reasonably

---

7. The attorney-client privilege does not extend to communications in furtherance of a crime or fraud. *See United States v. Zolin*, 491 U.S. 554, 562–63, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). The district court explicitly rejected the argument and the Department does not argue before this court, as it did before the district court, that the materials fall under this exception. Rather, they rely on their argument that the privilege was waived.

designed' to protect the privilege.... Conversely ... the privilege [will be deemed] to be waived if the privilege holder fails to pursue all reasonable means of preserving the confidentiality of the privileged matter." *de la Jara*, 973 F.2d at 750 (internal citation omitted). *See also* Moore's Federal Practice 3d § 26.47[5].

The pitfalls of inadvertent disclosure and the dilemma posed for counsel who are in receipt of such materials has prompted the American Bar Association Standing Committee on Ethics and Professional Responsibility to issue two formal opinions on the subject. These opinions reflect some of the same principles articulated in *Zolin*. In November 1992, the Committee issued an opinion, based upon the Model Rules of Professional Conduct, relating to the inadvertent disclosure of confidential materials. The opinion provides:

> A lawyer who receives materials that on their face appear to be subject to the attorney-client privilege or otherwise confidential, under circumstances where it is clear that they were not intended for the receiving lawyer, should refrain from examining the materials, notify the sending lawyer and abide the instructions of the lawyer who sent them.

ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 368 (1992). Two years later, the Committee issued another formal opinion, this one regarding the unsolicited receipt of privileged or confidential materials. The committee stated:

> A lawyer who receives on an unauthorized basis materials of an adverse party that she knows to be privileged or confidential should, upon recognizing the privileged or confidential nature of the materials, either refrain from reviewing such materials or review them only to the extent required to determine how appropriately to proceed; she should notify her adversary's lawyer that she has

such materials and should either follow instructions of the adversary's lawyer with respect to the disposition of the materials, or refrain from using the materials until a definitive resolution of the proper disposition of the materials is obtained from a court.

ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 382 (1994).

In the present case, the district court found that counsel implicitly authorized and encouraged department employees to search for and photocopy letters from opposing counsel that were kept in the inmates' legal files related to this case. This happened not once, or twice, but several times over the course of over nine months. The confidential status of the letters was facially evident—they were on legal letterhead easily identifiable as that of opposing counsel. One letter to an inmate even specified that it was "for your eyes only." But if that was not enough, the contents of the letters remove all doubt. They contained, in the words of the district court, a "summary of [plaintiffs' counsel's] analysis of the strengths of some of Plaintiffs' claims, settlement prospects and prospects for recovery at trial"—this at the same time that the parties were conducting settlement negotiations. The letters reviewed litigation strategy, theories of the case, and other sensitive issues. Further correspondence discussed the evidence available regarding "actual injuries resulting from [the Department's] alleged failure to provide constitutionally required access to the courts." In short, these documents were of the most sensitive kind—the kind that any trial lawyer would recognize as privileged, highly valuable, very confidential, and potentially devastating in the wrong hands.

Thus, there can be no serious question that the material in the present case was privileged. *See In re Grand*

*Jury Investigation,* 974 F.2d 1068, 1070–71 (9th Cir.1992). In sorting the materials into categories, including documents that might be privileged, the Department's counsel demonstrated that they understood the legal import of this treasure trove of documents. In fact, the significance was explained to them more directly by an official from the Idaho State Bar. Eight months after the first documents were acquired, co-counsel went to his superior, who sought advice from the state bar. The bar official and the supervisor advised co-counsel not to read any more documents and to turn over to the court those already in their possession. But, even with the advice of the Bar, counsel for the State plowed ahead, receiving and reading more documents. Finally, in a remarkable display of chutzpah, counsel did go to the court—but with a motion for contempt, premised on the inmates' privileged documents.

 Counsel for the state reasoned at the time, and the Department continues to argue to this court, that the inmates waived any applicable privilege by storing the *"Gomez"* binders in a section of the library accessible to prison employees. The Department's argument that the privilege was waived is without merit. Given the significance of the documents, the inmates of course took steps to maintain their confidentiality. As the district court found, by marking the binders with the name of the case, placing it on a restricted-access shelf, and requiring a sign-out procedure for use of the file, "the inmates could not have done anything more to secure the confidentiality of these documents because there are no areas in the prison that are accessible only to inmates."

Thus, the inmates' actions to preserve the confidentiality of the materials were not only reasonable, but were found, as a question of fact, to be the best possible in the prison context. The prison setting poses unique challenges to the privilege issue because of security and physical layout considerations. And the prison, of course, has a penological interest in curtailing the prisoner's privacy rights. *See Hudson v. Palmer,* 468 U.S. 517, 530, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (inmates have no expectation of privacy in their living quarters); *Bell v. Wolfish,* 441 U.S. 520, 537, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (prisoner's privacy rights curtailed by prison's security interests). The Department, however, does not urge us to conclude that the reduced privacy required by penological necessity renders it impossible for inmates to keep privileged documents confidential. To so conclude would undermine a critical component of the right of access to the courts, namely, the opportunity to receive privileged communications from counsel. As the Supreme Court has held, the inmates' First Amendment and other rights pertaining to privileged correspondence are "not inconsistent with [their] status as . . . prisoners or with the legitimate penological objectives of the correctional system." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

The district court found that the Department had in place reasonable policies providing precautions that were intended to protect and preserve the confidential nature of attorney-client correspondence. We conclude that the district court did not clearly err when it found that the inmates did all they could to secure the documents' confidentiality and that they did not waive the privilege.

**B. Inherent Power**

 A court has the inherent power to sanction a party or its lawyers if it acts in "willful disobedience of a court order . . . or when the losing party has acted in bad faith, vexatiously, wantonly, or for oppres-

sive reasons," as well as for "willful[ ] abuse [of the] judicial processes." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980) (internal citations and quotations omitted); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 46–47, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (where litigant "engaged in bad faith or willful disobedience of a court's order," inherent power "extends to a full range of litigation abuses"). We review a court's imposition of sanctions for abuse of discretion. *See Chambers*, 501 U.S. at 55, 111 S.Ct. 2123 (inherent power).

 We recently addressed the appropriate basis for an award of sanctions under a court's inherent authority in *Fink v. Gomez*, 239 F.3d 989 (9th Cir.2001). We held that *Roadway* and *Chambers* require that inherent-power sanctions be preceded by a finding of bad faith, or conduct tantamount to bad faith. *Id.* at 993. Under this standard, although recklessness, of itself, does not justify the imposition of sanctions, sanctions are available when recklessness is "combined with an additional factor such as frivolousness, harassment, or an improper purpose." *Id.* at 994. Sanctions, then, are justified "when a party acts *for an improper purpose*—even if the act consists of making a truthful statement or a non-frivolous argument or objection." *Id.* at 992 (emphasis in original).

 We conclude that the district court did not clearly err in finding conduct tantamount to bad faith here. *See Pacific Harbor Capital, Inc. v. Carnival Air Lines, Inc.*, 210 F.3d 1112, 1117 (9th Cir. 2000) (district court's finding as to bad faith is reviewed for clear error). The notion that receipt of privileged communications imposes a duty on counsel to take some reasonable remedial action is hardly a novel concept. It stems from common sense, ethical rules and the origins of the privilege. Of course, had Department counsel entertained any doubt that they possessed the materials improperly, the opinion of the Idaho State Bar representative should have dispelled it. Yet—and this is particularly troubling for us, as it was for the trial court—the attorneys continued to collect and read documents after being advised by the state bar to send the documents to the court. As the district court concluded, counsel "each had an individual ethical and professional duty to immediately seal and submit to the Court both the initial correspondence and the correspondence subsequently received from [Department] personnel as soon as they became aware that the correspondence involved confidential communications between [inmates' counsel] and the inmate plaintiffs."

Department counsel's actions in this case do not pass even the most lenient ethical "smell test." They knowingly disregarded advice from the bar counsel and bypassed questions of ethics in an effort to gain advantage in this litigation. Despite their roles as officers of the court, they failed to inform the court of their possession of the privileged materials until eight months after the first acquisition. In view of the circumstances surrounding the acquisition and use of the privileged documents, we conclude that the district court did not abuse its discretion in finding that the attorneys acted in bad faith and in imposing sanctions under the court's inherent power.

## C. Section 1927

 The court also based its sanctions decision on § 1927, which authorizes sanctions against an attorney who "multiplies the proceedings in any case unreasonably and vexatiously...." 28 U.S.C. § 1927. Section 1927 requires a finding of recklessness or bad faith. *In re Keegan Mgmt. Co.*, 78 F.3d 431, 436 (9th Cir.1996).

Sanctions are available under § 1927, however, only if the attorney "unreasonably and vexatiously" multiplies proceedings. 28 U.S.C. § 1927. In the present case, the Department's contempt motion resulted in a hearing on that motion plus a three-day evidentiary hearing on the follow-on sanctions motion, in effect adding an extra "trial" to the declaratory and injunctive relief action. The court found, as a question of fact, that "[u]nnecessary litigation was created by the series of events of secretly acquiring, reading, retaining, sharing information with representatives of [the Department], and using the information for potential tactical advantage instead of promptly notifying opposing counsel and/or submitting the documents to the Court...." In the face of this finding, the court did not abuse its discretion in awarding sanctions under § 1927.

In closing, the district court noted that the sanctions were no more than necessary "in order to preserve the time-honored principles involved or to maintain public trust in the legal profession." We agree. The result here does not set up an impractical or insurmountable hurdle for counsel facing an ethical dilemma concerning privileged documents. The path to ethical resolution is simple: when in doubt, ask the court.

AFFIRMED.

RONALD M. GOULD, Circuit Judge, concurring in the judgment:

I concur in parts I, II, III, IV.A, and IV.C of the majority opinion and in the judgment affirming the district court. The sanctions properly can be affirmed pursuant to 28 U.S.C. § 1927 because the conduct of counsel for the state was so unjustified as to be in reckless disregard of the inmates' rights. *United States v. Blodgett,* 709 F.2d 608, 610 (9th Cir.1983) ("imposition of sanctions under section 1927 requires a finding that counsel acted reck-

lessly or in bad faith, while those imposed under the court's inherent power require a finding that counsel's conduct constituted or was tantamount to bad faith") (internal quotation marks and citations omitted). I would, however, stop short of holding that counsel for the state acted in bad faith and I do not concur in part IV.B of the majority opinion.

Counsel for the state made serious errors of judgment. The record does not establish intentional acts of subjective bad faith, however, because the record as a whole supports that counsel proceeded under the mistaken assumption that the attorney-client privilege was waived and advanced a mistaken theory that inmates' counsel was committing a fraud on the court. I conclude that counsel for the state were seriously wrong in their assessment on both these issues, but I do not conclude that counsel acted with any intentional ill motive. Nor would I sustain a finding of fact that government counsel acted in bad faith; this determination rests on an issue of degree affecting the possible waiver of privilege that was debatable before the district court's finding that inmates took reasonable steps to protect confidential materials. In any event, bad judgment is not tantamount to bad faith.

It is unfortunate that the important issues of inmates' rights and legitimate penological concerns of the government to a degree were obscured by distracting disputes between counsel about their professional ethics. Initially, counsel for the state challenged inmates' counsel asserting fraud on the court and asking for a contempt determination. Later, inmates' counsel accused counsel for the state of acting in bad faith, asking for a sanctions determination. The ethics dispute necessarily focused attention on the lawyers and off the issues at stake between inmates and corrections officials.

Based on the district court's findings, I would affirm the imposition of sanctions without finding subjective bad faith on the part of counsel for the state.