# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE STATE OF DELAWARE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| *Ex Rel.* | ) | |
| | ) | |
| RUSSELL S. ROGERS, | ) | |
| Plaintiff-Relator, | ) | |
| | ) | |
| v. | ) | C.A. No. N18C-09-240 |
| | ) | PRW CCLD |
| THE BANCORP BANK, | ) | |
| INTERACTIVE COMMUNICATIONS | ) | |
| INTERNATIONAL, INC., | ) | |
| and INCOMM FINANCIAL | ) | |
| SERVICES, INC., | ) | |
| Defendants. | ) | |

Submitted: November 29, 2022
Decided: January 3, 2023

*Upon Defendant InComm Financial Services' Motion for Disqualification and Reimbursement of Fees and Costs,*
**GRANTED in part, DENIED in part.**

## MEMORANDUM OPINION AND ORDER

Catherine A. Gaul, Esquire, Randall J. Teti, Esquire, ASHBY & GEDDES, Wilmington, Delaware, Joshua A. Goldberg, Esquire, Jane Metcalf, Esquire, Clinton W. Morrison, Esquire, Christina Seda-Acosta, Esquire, PATTERSON BELKNAP WEBB & TYLER LLP. *Attorneys for Defendants Interactive Communications International, Inc. and InComm Financial Services, Inc.*

Daniel C. Mulveny, Esquire, Oliver Cleary, Esquire, Deputy Attorneys General, STATE OF DELAWARE, DEPARTMENT OF JUSTICE, Wilmington, Delaware. *Attorneys for Plaintiff State of Delaware.*

Jody C. Barillare, Esquire, MORGAN, LEWIS & BOCKIUS LLP, Wilmington, Delaware, Eric W. Sitarchuk, Esquire, Ezra D. Church, Esquire, Ryan P. McCarthy, Esquire, Morgan, Lewis & Bockius LLP, Philadelphia, Pennsylvania. *Attorneys for Defendant The Bancorp Bank.*

Bruce E. Jameson, Esquire, Samuel L. Closic, Esquire, Mary S. Thomas, Esquire, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware, David Brackett, Esquire, Benjamin E. Fox, Esquire, John E. Floyd, Esquire, BONDURANT, MIXSON & ELMORE, LLP, Atlanta, Georgia. *Attorneys for Plaintiff-Relator Russell S. Rogers.*

**WALLACE, J.**

The Court here resolves Defendant InComm Financial Services, Inc.'s Motion for Disqualification and Reimbursement of Fees and Costs. For the reasons set forth below, the prayer for disqualification is **GRANTED** as to Benjamin E. Fox, Esquire, but **DENIED** as to Bondurant, Mixson & Elmore, LLP. The application for reimbursement of fees and costs is **GRANTED, in part,** and **DENIED, in part**.

## I. PROCEDURAL BACKGROUND

The parties and the Court are well-acquainted with the factual and procedural background of this Delaware False Claims and Reporting Act ("DFCRA") action.[1] A detailed summary of the facts is set forth more fully in the Court's earlier Opinion and Order Denying Defendants' Motion to Amend the Case Management Order.[2] Here, the Court provides just the procedural background necessary to the disqualification question now posed.

To date, the parties have engaged in numerous rounds of motions and pleading practice, with this round instigated, in part, by a court-appointed Special Master's Report related to a discovery issue.[3]

The Special Master was tasked with facilitating a discovery dispute arising out of Relator's counsel's admission that his law firm, Bondurant, Mixson & Elmore

---

[1]    *See State ex rel. Rogers v. Bancorp Bank*, 271 A.3d 742 (Del. Super. Ct. 2022).

[2]    *Id.*

[3]    Special Master's Confidential Final Report, Jan. 7, 2022 (D.I. 247). *See* D.I. 248 for the Public Redacted version.

-1-

LLP ("Bondurant"), was privy to sensitive and potentially privileged InComm Financial Services, Inc. ("InComm") materials. In an interrogatory response, Bondurant disclosed, for the first time, that following Plaintiff-Relator's November 2018 termination from InComm, Plaintiff-Relator gave his InComm-issued laptop to Bondurant.[4]

Bondurant loaded the laptop's entire hard drive and files onto its internal document review platform.[5] "That laptop, the parties agree, contained privileged materials and work product."[6] Between November 2018 and January 2019, members of Bondurant reviewed no less than 850 documents from the InComm laptop.[7] Bondurant turned over 108 of those documents to the State in support of Plaintiff-Relator's DFCRA claims and complaint.[8]

When this came to light, the Special Master was tasked with determining whether, and to what extent, Bondurant and its lawyers had reviewed InComm's privileged documents that were stored on the laptop.[9] The Special Master's audit

---

[4] *State ex rel. Rogers,* 271 A.3d at 744. Relator alleges this DFCRA action was filed under seal *before* his employment was terminated; and to that end, he disputes any allegations that he was fired based on his job performance. *See* Relator's Answering Br. in Opp'n at 6, Mar. 1, 2022 (D.I. 264).

[5] *State ex rel. Rogers,* 271 A.3d at 744. Once that copy was made, the physical laptop was returned to InComm, which was made none the wiser about this diversion.

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.* at 744-45.

revealed that 36,648 documents were copied from the InComm laptop onto Bondurant's DISCO database.[10] And of those documents, 874 were "accessed" by Bondurant.[11]

InComm then had an opportunity to review all 874 documents to determine whether any were privileged or confidential.[12] After vetting the documents, InComm claimed attorney-client privilege over 59 of the 874 documents reviewed by Bondurant.[13] A secondary audit of the flagged 59 documents revealed that all 59 were "accessed by a single user, Benjamin Fox, a Bondurant attorney."[14]

Further review of those documents' metadata also revealed, to some degree, a chronicled narrative of what the Bondurant document review entailed. That narrative includes: (i) the identity of the user; (ii) when the document was uploaded to the database; (iii) whether the document was opened in the database viewer, or was "tagged" or downloaded in its native format, (iv) what types of "tags" were assigned to the documents; and (v) "information from which the parties could attempt to extrapolate for how long a particular document was open."[15] Those details aside, however, the Special Master noted that data limitations within the

---

[10] Special Master's Confidential Final Report at 5.

[11] *Id.* at 6.

[12] *Id.*

[13] *Id.*

[14] *Id.* at 6-7.

[15] *Id.*

DISCO platform hindered the ability to reconstruct the *entire* scope of a user's interaction with any individual InComm document.[16]

The Special Master continues to maintain custody of the InComm documents, thumb drives, and hard drives that Bondurant turned over.[17]  All data is archived on a document review database (eMerge) but can be restored and retrieved.[18]

With the Special Master's work complete, InComm filed the instant Motion for Disqualification and Reimbursement of Fees and Costs.[19]  Defendant Bancorp Bank joined InComm's Motion the same day it was filed.[20]  The State of Delaware filed a Brief in Opposition,[21] as did Plaintiff-Relator Rogers.[22]  InComm then submitted its Reply Brief in Further Support of its Motion.[23]

After that briefing, the Court held an office conference during which it asked the parties to answer the following:

- When was Mr. Rogers officially terminated?

- What communications were had about Mr. Rogers returning the laptop?

---

[16]  *See id.* at 8-11 ("While the Audit Trail is helpful in reconstructing certain aspects of user activity, it does not provide a second-by-second accounting of all user activity.").

[17]  *Id.* at 12-13.

[18]  *Id.*

[19]  D.I. 250.

[20]  D.I. 251.

[21]  D.I. 263.

[22]  D.I. 264.

[23]  D.I. 265.

- Was Mr. Rogers given a certain date to return the laptop?

- Did InComm follow-up with Mr. Rogers as to the status of the laptop's return when it was being copied by Bondurant?

- How long was the laptop in Bondurant's actual possession after Mr. Rogers was asked to return it?

- When did the State receive notice that Bondurant had made and was in possession of the entire forensic copy of InComm's laptop?

- Was the State ever notified that Bondurant had come into possession of the laptop itself, and that there may be privileged or potentially privileged materials on there?[24]

The Parties submitted supplemental briefing addressing these questions,[25] and then submitted a factual stipulation concerning the timeline of events.[26]

The Court conducted a hearing on the Motion for Disqualification and Reimbursement of Fees and Costs.[27] The Court then allowed the parties to submit letters addressing supplemental case citations and authorities referenced at that hearing.[28] All that being done, InComm's motion is now ripe for decision.

---

[24] May 17, 2022 Office Conference Tr. at 5-7 (D.I. 269).

[25] D.I. 271; D.I. 272; D.I. 273.

[26] Stipulated Timeline, June 7, 2022 (D.I. 277).

[27] July 22, 2022 Status Conference Tr. (D.I. 295).

[28] *Id.* at 115-16.

## II. FACTUAL BACKGROUND

Again, the Court has laid out a more fulsome factual summary in an earlier decision.[29]  Here, the Court summarizes the InComm laptop's timeline (and related events) derived from the parties' submissions, the Special Master's Report, and the hearing conducted.

On September 28, 2018, Mr. Rogers filed his Complaint against InComm under seal.[30]  That Complaint was submitted to the Court by Delaware counsel Pricket Jones & Elliott and *pro hac* counsel Bondurant.[31]  Attached to the Complaint, which was filed *in camera* and under seal, were 12 exhibits ostensibly provided by Mr. Rogers from InComm files he had access to as he was still an employee when the sealed Complaint was filed.

On October 10, 2018, Prickett Jones requested the Prothonotary deliver the sealed Complaint to the Delaware Department of Justice's Fraud and Consumer Protection Division.[32]

Approximately two weeks later, on October 15, 2018, InComm terminated Mr. Rogers for reasons wholly unrelated to this litigation.[33]  Along with the

---

[29]  *See State ex rel. Rogers*, 271 A.3d 742.

[30]  Stipulated Timeline at 2.

[31]  D.I. 33.

[32]  D.I. 15.

[33]  Stipulated Timeline at 2; Relator's Answering Br. in Opp'n at 6.

termination notice, Mr. Rogers was sent an email with a severance agreement for him to sign.[34] That severance agreement included a demand that Mr. Rogers return all InComm property to InComm.[35] Mr. Rogers ultimately returned his InComm laptop on October 19, 2018.[36] Sometime between Mr. Roger's termination on October 15, 2018, and his return of the laptop, on October 19, 2018, he wisely sought Bondurant's counsel. Bondurant copied all files saved on the laptop and had Mr. Rogers return it to InComm.[37]

Starting on November 16, 2018, Bondurant began examining the laptop's contents on Bondurant's discovery platform.[38]

Ostensibly Bondurant's post-complaint copying of the laptop and examination of its contents was kept from Prickett Jones—which had been engaged

---

[34] D.I. 273, Ex. A. Along with the severance agreement, Mr. Rogers was provided with InComm's Employment Agreement and Employee Handbook, which he had previously signed. *See* D.I. 250, Ex. 1 (Employment Agreement) ¶ 4 ("Employee acknowledges that during Employee's employment he/she shall obtain property from the Company. Employee agrees to immediately return all property of the Company in Employee's possession or otherwise compensate the Company for the replacement value of lost or stolen property immediately upon termination of employment."); *id.*, Ex. 2 (Employee Handbook) ¶ 4 ("Employees may not directly, indirectly or through any third person or entity disclose, inform, convey, divulge, communicate, disseminate, advise or transfer any confidential information outside the Company without first obtaining proper authorization.").

[35] D.I. 273, Ex. A at DETX-R00002964.

[36] Stipulated Timeline at 2.

[37] *Id.*; D.I. 182, Ex. B at 1 (Letter from Prickett Jones to Patterson Belknap Webb & Tyler LLP dated June 16, 2020) ("Prior to returning his laptop to ICI, Mr. Rogers gave it to his Georgia attorneys to make a copy for purposes of evidence preservation. At the direction of Georgia counsel, a complete forensic image of his laptop's hard drive was made, including copies of Mr. Rogers' email and document files saved to his laptop.").

[38] *See* InComm's Mot. for Disqualification and Reimbursement, Ex. BB, Jan. 21, 2022 (D.I. 250).

from at least the start of litigation—and from the Attorney General—who was at that very time investigating and deciding whether to intervene.

On November 20, 2018, the Attorney General moved to extend the seal of the Complaint and time to intervene.[39]  The Court granted that request.[40]

On May 6, 2019, the Court granted the State's request to intervene.[41]  And on May 28, 2019, the Court unsealed the Complaint.[42]

On June 1, 2020, in response to an interrogatory, Relator admitted he made a digital copy of the laptop.[43]

Between June 2020 and the Court's Order of Reference to the Special Master, the parties engaged in a letter-writing campaign concerning the existence of the InComm Laptop files, the scope of those files, and the existence of privileged material in those files.[44]  During that skirmish, Prickett Jones represented only Bondurant had access to the laptop files and insisted that possession of those files was for preservation only.[45]  And Bondurant wrote to Defendant's Counsel that it

---

[39]  D.I. 17. That Motion was submitted jointly by the Attorney General, Prickett Jones, and Bondurant. *Id*.

[40]  *Id.*

[41]  Stipulated Timeline at 2.

[42]  *Id.*

[43]  *Id.*

[44]  *See* D.I. 182, Exs. A to P.

[45]  *Id.*, Ex. B. at 2.

> Since completing the Section 1203(b)(2) review, the forensic image of the laptop's hard drive and the laptop's email and document files have been retained securely

-8-

had "performed a targeted search to provide documents to the State of Delaware in compliance with Relator's obligations under" the Delaware False Claims Act.[46] The letter also stated that "no privileged information was reviewed or identified during this process."[47]

## III.  APPLICABLE LEGAL STANDARDS

### A. DISQUALIFICATION OF COUNSEL IN DELAWARE

Delaware has yet to address counsel disqualification in a *qui tam* context. And what guidance a Delaware trial court might otherwise avail itself of when tackling the issue is limited,[48] with most instances regarding violations of the Rules of

---

by Georgia counsel to avoid any destruction of evidence and preserve an intact chain of evidence. Other than as described above, these files have not been used, and Mr. Rogers has not personally had access to the contents of his laptop (apart from the documents produced in this action), at any time after he returned the laptop to ICI.

*Id.* The State said it was informed of Bondurant's possession of the InComm Laptop files in September 2020:

After receiving Ms. Metcalf's September 18, 2020 email, the State was informed that before the State intervened in this case, Bondurant had made a forensic copy ("image") of Relator's laptop and that Mr. Fox had accessed that image using an electronic document review platform.

State's June 7, 2022 Letter, June 7, 2022 (D.I. 271) at 3-4 (citation omitted).

[46]  D.I. 182, Ex. F at 1 (Bondurant's September 4, 2020 Letter to InComm).

[47]  *Id.* at 2.

[48] *See, e.g., Sequoia Presidential Yacht Gp. LLC v. FE P'rs, LLC*, 2013 WL 3362056, at *1 (Del. Ch. July 5, 2013) (deferring decision on revocation of *pro hac vice* admission pending Delaware Office of Disciplinary Counsel review after finding that because the "substantive litigation" concluded there was "little" risk of ongoing or future prejudice); *Manning v. Vellardita*, 2012 WL 1072233, at *3 (Del. Ch. Mar. 28, 2012) (denying disqualification in the conflict-of-interest context where counsel had access to confidential information, after finding the "representation . . . d[id] not confer an advantage on the Plaintiffs in such a way that the Defendants are unfairly prejudiced in their ability to mount a defense in this case" because "at least one of the Plaintiffs .

Professional Conduct occurring in far different circumstances.[49]  Even then, the strokes are broad, cautioning that an ethical violation alone is not enough to warrant counsel's disqualification,[50] that disqualification motions are disfavored and extreme, and that, in any instance, relief upon motion might be allowed only when a trial judge determines the continued "representation frustrates the fairness of the proceedings."[51]

So, as a general matter, a party moving for disqualification of opposing counsel must show "by clear and convincing evidence, (1) either an actual violation

---

. . [also] had access to any information that could have been available" to the allegedly-conflicted counsel); *Crowhorn v. Nationwide Mut. Ins. Co.*, 2002 WL 1274052, at *1, *5 (Del. Super. Ct. May 6, 2002) (denying motion to revoke *pro hac vice* admission for alleged "repeated instances of rudeness, incivility and obstruction" because the rudeness and incivility was "an example of children in the sandbox throwing sand at each other" and because plaintiff "submit[ted] no factual proof" as to the obstruction allegation).

[49]  *See, e.g.*, *Triumph Mortg. Corp. v. Glasgow Citgo, Inc.*, 2018 WL 1935968, at *2 (Del. Super. Ct. Apr. 19, 2018); *see also Acierno v. Hayward,* 2004 WL 1517134, at *4 (Del. Ch. July 1, 2004).

[50]  *Dollar Tree, Inc. v. Dollar Express LLC*, 2017 WL 5624298, at *5 (Del. Ch. Nov. 21, 2017) (citing *In re Appeal of Infotechnology, Inc.*, 582 A.2d 215, 216-17 (Del. 1990)).

[51]  *Sanchez-Caza ex rel. Sanchez v. Est. of Whetstone*, 2004 WL 2087922, at *1 (Del. Super. Ct. Sept. 16, 2004) (citing *In re Est. of Waters,* 647 A.2d 1091, 1098 (Del. 1994)); *accord Dollar Tree, Inc.*, 2017 WL 5624298, at *5 ("[a]s a threshold matter, . . . the court must consider whether the alleged violation of the Rules is sufficiently serious to prejudice the fairness of the proceeding. If not, then the alleged violation falls within the jurisdiction of the Delaware Office of Disciplinary Conduct, not this court." (citation omitted)).

*See Dunlap v. State Farm Fire and Cas. Co. Disqualification of Counsel,* 2008 WL 2415043, at *1 (Del. May 6, 2008) ("A motion to disqualify must contain clear and convincing evidence establishing a violation of the Delaware Rules of Professional Conduct so extreme that it calls into question the fairness or the efficiency of the administration of justice . . . vague and unsupported allegations are not sufficient to meet this disqualification standard." (cleaned up)); *see also Triumph Mortg. Corp.*, 2018 WL 1935968, at *2 (noting that when claiming a professional conflict in representation, the non-client's burden is to provide clear and convincing evidence that a conflict exists and how that conflict taints the fairness of the proceedings).

of the rules of professional conduct or litigation misconduct of counsel which (2) threatens the legitimacy of the judicial proceedings."[52] And the Court must be convinced that the misconduct "taints the proceeding."[53]

## B. DISQUALIFICATION OF COUNSEL OUTSIDE DELAWARE

Because Delaware, fortunately, has had to say so little on this topic, one might look to other State and Federal fora for some mapping of this not-often visited territory.[54]

In all circumstances, courts disfavor motions to disqualify—considering disqualification a "drastic measure which courts should hesitate to impose except when absolutely necessary."[55] A decision on a disqualification motion's merits

---

[52] *Postorivo v. AG Paintball Hldgs., Inc.*, 2008 WL 3876199, at *14 (Del. Ch. Aug. 20, 2008); *Crowhorn*, 2002 WL 1274052, at *4 (moving party must show "by clear and convincing evidence that the behavior of [counsel] has affected the fairness of the proceedings before this Court, or that in the future such conduct will continue").

[53] *Infotechnology*, 582 A.2d at 221; *id.* at 216-17 (noting a trial court can discipline counsel if "the challenged conduct *prejudices* the fairness of the proceedings, such that it adversely affects the fair and efficient administration of justice . . . ." (emphasis added)).

Because Mr. Fox and the Bondurant firm are before this Court on motions *pro hac vice*, this motion to disqualify also implicates Superior Court Civil Rule 90.1. Under that Rule:

> The Court may revoke a pro hac vice admission *sua sponte* or upon the motion of a party, if it determines, after a hearing or other meaningful opportunity to respond, the continued admission pro hac vice to be *inappropriate or inadvisable*.

Del. Super. Ct. Civ. R. 90.1(e) (emphasis added); *see Page v. Oath, Inc.*, 2022 WL 162965, at *3 (Del. Jan. 19, 2022); *State v. Mumford*, 731 A.2d 831, 835-36 (Del. Super. Ct. 1999).

[54] *City of Wilm. v. Wilm. Firefighters Loc. 1590, Int'l Ass'n of Firefighters*, 385 A.2d 720, 723 (Del. 1978) ("[W]e look for guidance to the procedure adopted in the Federal forums and by the Courts and administrative tribunals in other States for dealing with such situations.").

[55] *Carlyle Towers Condo. Ass'n, Inc. v. Crossland Sav., FSB*, 944 F.Supp. 341, 345 (D.N.J. 1996) (citation omitted).

requires a court to carefully balance a litigant's right to choose his counsel against the possibility of misuse of such application for strategic gain.[56] "Close judicial scrutiny of the facts of each case is 'required to prevent unjust results.'"[57] And "[a]lthough doubts [in some scenarios] are to be resolved in favor of disqualification, [even then] the party seeking disqualification must carry a 'heavy burden' and must meet a 'high standard of proof' before a lawyer is disqualified."[58] Indeed, just as in Delaware, it seems elsewhere the moving party shoulders a heavy burden of showing opposing counsel's misconduct by clear and convincing evidence.[59]

## IV. THE PARTIES' CONTENTIONS

### A. INCOMM'S MOTION FOR DISQUALIFICATION

InComm urges the Court to disqualify and dismiss Relator's *pro hac* counsel, Mr. Benjamin Fox, and his law firm, Bondurant, from further participation in this litigation.[60]

InComm argues Mr. Fox, and members of the Bondurant firm, committed egregious ethical misconduct in the handling and reviewing of privileged and

---

[56] *United States ex rel. Thomas v. Duke Univ.*, 2018 WL 4211372, at *2 (M.D.N.C. Sept. 4, 2018) (citing *Shaffer v. Farm Fresh, Inc.,* 966 F.2d 142, 146 (4th Cir. 1992)).

[57] *Carlyle Towers Condo. Ass'n, Inc.*, 944 F.Supp. at 345 (quoting *Gould Inc. v. Mitsui Mining & Smelting Co.,* 738 F.Supp. 1121, 1126 (N.D. Ohio 1990)).

[58] *Alexander v. Primerica Hldgs., Inc.,* 822 F.Supp. 1099, 1114 (D.N.J. 1993) (citations omitted).

[59] *United States ex rel. Thomas*, 2018 WL 4211372, at *1 (motions to disqualify "typically require proof of willful misconduct by clear and convincing evidence" (collecting cases)).

[60] InComm's Mot. for Disqualification and Reimbursement at 1-3.

-12-

confidential documents copied from the InComm laptop.[61] Not only did the firm fail to implement any ethical screens or procedures to safeguard privileged materials, but it revisited, on numerous occasions, patently obvious privileged documents, *e.g.*, "emails containing advice from in-house counsel, and several attorney markups of draft issuing bank agreements."[62] And despite the "clear indicia of privilege" on these documents, Mr. Fox tagged them "Responsive" or "Ask Client," suggesting his further review *and* discussion of the privileged documents with Plaintiff-Relator.[63]

InComm also argues disqualification is necessary because Bondurant's tactical decisions and strategies from when it first received InComm's laptop have disrupted and continues to endanger the integrity of these proceedings.[64] At the onset, when InComm terminated Mr. Rogers, it required him, pursuant to his employment agreement, to return his company-issued laptop that "contained a trove of confidential materials, . . . financial reports; cardholder data; proprietary information related to InComm's operations and cashflow; and legal analyses and advice."[65] Mr. Rogers instead gave the laptop to Bondurant, which then copied all

---

[61]  *Id.* at 17-26.

[62]  *Id.* at 10-11 (citation omitted).

[63]  *Id.* at 11.

[64]  *Id.* at 17-18.

[65]  *Id.* at 4-5 (citation omitted).

of the laptop's 36,000+ files onto its own document management platform and failed to implement any ethical screening processes.[66]  Neither Mr. Rogers nor Bondurant informed InComm of this clandestine data transfer.[67]

InComm first learned of Bondurant's possession of these documents in response to an interrogatory almost two years after this litigation had commenced.[68]  Only then, and *after* the Court's appointment of a Special Master, did Bondurant, during the Special Master's examination, finally admit to and reveal the breadth of its review of InComm's privileged documents.[69]  And even after all that, InComm posits that Bondurant *still* refuses to wall itself off from Delaware counsel or remove Mr. Fox as lead counsel.[70]

InComm asserts Bondurant's actions have significantly tainted the proceedings and disqualification is the only effective means to cure the resultant prejudice.[71]  It argues Mr. Fox cannot "un-see" or "un-learn" his "ill-gotten knowledge" from his review of the privileged materials; thus, "absent disqualification, InComm will be forced to defend this case with the 'nagging

---

[66]  *Id.* at 5-6 (citation omitted).

[67]  *Id.* at 5 (citation omitted).

[68]  *Id.* at 14 (citation omitted).

[69]  *Id.* at 14-17.

[70]  *Id.* at 20, 28.

[71]  *Id.* at 26.

suspicion' that its adversary has 'benefitted from confidential information.'"[72]

Finally, InComm asks to be reimbursed for its fees and costs associated with "uncovering and remedying" Bondurant's misconduct, and to shift costs of the Special Master to Bondurant.[73] InComm posits that Bondurant alone should bear the costs because its disingenuous conduct required the Special Master's involvement.[74]

## B. THE STATE OF DELAWARE'S POSITION

The State is neither partial to one version of events nor does it take a position on how the Court should resolve this round because it says most of the contested factual issues occurred prior to its intervention.[75] But because the State's interest in *qui tam* actions *is* to prosecute fraud—and it learned of Defendants' alleged fraud here only when Relator filed his complaint—it opposes the motion for public policy reasons.[76]

Pointing to the DFCRA's federal analog, the State emphasizes that the Act's purpose is intended "to discourage fraud against the government and, concomitantly, the purpose of the qui tam provision of the Act is to encourage those with knowledge

---

[72] *Id.* at 19, 22, 28 (quoting *Maldonado v. N.J. ex rel. Admin. Office of Cts.-Prob. Div.*, 225 F.R.D. 120, 141 (D.N.J. 2004)).

[73] *Id.* at 33-37.

[74] *Id.*

[75] State's Answering Br. in Opp'n at 3-4, Mar. 1, 2022 (D.I. 263).

[76] *Id.* at 3-8.

of fraud to come forward."[77] Insisting Relator did what the DFCRA expected of him, the State suggests a decision favoring InComm's position will flout the Act's purpose.[78] Should the Court adopt InComm's position, the State argues, it "would signal to the bar at large that anyone representing a relator bears the risk of not only liability for breach of a confidentiality or employment agreement but also the potential reputational effect that comes with defending against a motion for disqualification."[79] As such, the State argues public-policy considerations require denial of InComm's Motion.[80]

And lastly, the State suggests that for InComm to succeed on its motion under the DFCRA, their burden "to show clear and convincing evidence of *actual* prejudice resulting from the exposure should be even higher" than what's required in typical attorney-conflict-disqualification circumstances.[81]

---

[77] *Id.* at 5-6 (quoting *United States ex rel. Head v. Kane Co.*, 668 F.Supp.2d 146, 152 (D.D.C. 2009) (cleaned up)).

[78] *Id.* at 4-5.

[79] *Id.* at 3-4, 6.

[80] *Id.* at 5-8 ("Defendants' Motion conflicts with the strong public policy embedded in the DFCRA that protects Relator, *and his counsel*, from liability for reasonably collecting and preserving discoverable information relevant to Defendant's alleged fraud." (emphasis in original)).

[81] *Id.* at 3-4 & n.12 (emphasis in original) (citing *Sun Life Assurance Co. of Canada v. Wilm. Sav. Fund Soc'y, FSB*, 2019 WL 6998156, at *2 (Del. Super. Ct. Dec. 19, 2019) *appeal dismissed, remanded, and vacated*, *Sun Life Assurance Co. of Canada v. Wilm. Savs. Fund Soc'y, F.S.B.*, 2021 WL 964894 (Del. Mar. 15, 2021)).

.

## C. PLAINTIFF-RELATOR RUSSELL ROGERS' POSITION

Emphasizing the data limitations referenced in the Special Master's Report, Relator argues all of InComm's contentions are speculative at best.[82] In his view, InComm has neither proved its claims with clear and convincing evidence, nor has it established that it's suffered actual prejudice.[83] Because the DISCO audit could not determine how long a document remained open on a user's monitor, Relator argues InComm's position that Bondurant extensively or repeatedly reviewed certain documents is contradicted by the Special Master's Report.[84]

With respect to InComm's criticism of Mr. Fox, Relator argues that Mr. Fox carefully navigated the complicated issues common in all *qui tam* actions.[85] Incanting Section 1203(b)(2), Relator asserts Mr. Fox copied the laptop documents to prevent the destruction of evidence, searched all files to ensure compliance with the statute, and in so doing, "avoided reading anything bearing indicia of possible privilege."[86]   And, Relator suggests that DFCRA requirements initially

---

[82]   Relator's Answering Br. in Opp'n at 1.

[83]   *Id.*

[84]   *Id.* at 28-33; *see also id.* at 13 (DISCO "does not record the duration of actions; nor does it indicate when a document is closed from a 'view.' As a result, the time that a document remained open on DISCO cannot be determined conclusively." (citations omitted)).

[85]   *Id.* at 4 (citing John E. Clark, *Ethics Issues in Qui Tam Litigation: Some Thoughts From The Perspective of a Relator's Counsel*, ABA CENTER FOR CONTINUING LEGAL EDUC., N02CFCB ABA-LGLED I-1, Nov. 28-20, 2001)).

[86]   *Id.* at 5.

precluded Mr. Fox from notifying InComm of his possession of the materials because the Complaint remained under seal until the State finished its investigation.[87]

Relator also contends InComm "inflates" the number of privileged documents potentially reviewed by Bondurant because many are duplicates—37 of the 59 documents are redlined mark-ups of contracts.[88] Further broken down, Relator asserts:

> Of the 33 marked-up agreements remaining on InComm's list, 19 are duplicates, leaving 14 unique agreements. Of these 14, InComm asserts privilege for 2 based on comments alone and for another 9, based on comments and edits. But the Special Master noted that under Bondurant's DISCO settings, Word documents, such as these agreements, would display redlined edits (*i.e.*, tracked changes), but not comments. Fox therefore never saw any of the purportedly privileged comments.

> \* \* \*

> As a result, the full scope of InComm's allegedly privileged information contained within documents 'viewed,' however briefly, during the targeted review comprises: (a) tracked changes in at most 12 draft agreements; (b) portions of 9 email threads; and (c) a single memorandum.[89]

---

[87]   *Id.* To that end, Plaintiff-Relator says that none of the documents Mr. Fox identified as material and provided to the State were privileged. *Id.* at 9.

[88]   *Id.* at 14. "Relator was not involved in legal analysis . . . but was often asked to forward InComm's proposed revisions of agreements to his contacts at banks doing business with InComm." *Id.* at 14-15 (citations omitted).

[89]   *Id.* at 15-16 (internal citations omitted).

In sum, Relator contends InComm's Motion should be denied because Delaware law requires a showing of clear and convincing evidence that a movant suffered actual prejudice.[90] And because InComm's "nagging suspicion" that its privileged documents will be used against it is speculative at best, it has failed to carry that burden.[91] Relator asks the Court to deny InComm's Motion on that basis as well as deny its request for costs and fees.[92]

## V. DISCUSSION

*Qui tam* litigation can present some peculiar ethical and legal questions for the attorneys involved. And no doubt, there is a certain allowance of behavior by whistleblowers and their counsel that would never be countenanced in other types of cases. But it is hardly the-ends-justify-any-means exercise that the Relator and the State envisage.

Of the vast cross-circuit decisions defusing the extremes of various attorney misconduct, the facts here fall somewhere in the middle. So, the remedy here, seeks to strike the right balance of consistency and proportionality expected in these circumstances.

---

[90]  *Id.* at 39-41 (citing *In re Rehab. of Indem. Ins. Corp., RRG*, 2014 WL 637872, at *1 (Del. Ch. Feb. 19, 2014) and *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Stauffer Chem. Co.*, 1990 WL 140438, at *1 (Del. Super. Ct. Sept. 13, 1990)).

[91]  *Id.*

[92]  *Id.* at 41.

## A. NO MATTER HOW UNACCEPTABLE THE ATTORNEY BEHAVIOR, PREJUDICE MUST ENSUE.

A trial court can discipline counsel if "the challenged conduct *prejudices* the fairness of the proceedings, such that it adversely affects the fair and efficient administration of justice . . . ."[93]  In any disqualification or attorney disciplinary action, prejudice as currently defined is a bit elusive.

Bondurant argues the Court must require InComm to present "clear and convincing evidence" that there was "'an *actual impact* on the administration of justice . . . .'"[94]  And as Bondurant would have it, anything short of a decipherable line drawn from what Mr. Fox saw that could be deemed privileged and what has appeared in some State or Relator filing means the necessary prejudice finding cannot be made.

For this proposition, Bondurant cites *Hunt v. Court of Chancery*.[95]  In *Hunt*, the Delaware Supreme Court reviewed a trial court's disqualification decision and whether an unprofessional email "had an impact on the administration of justice."[96]  *Hunt* found *In re Hurley*—a bar disciplinary action that addressed an attorney's

---

[93]  *Infotechnology*, 582 A.2d at 216-17 (emphasis added).

[94]  Relator's Suppl. Letter at 3-4, Aug. 5, 2022 (D.I. 288) (emphasis added) (quoting *Hunt v. Court of Chancery*, 2021 WL 2418984, at *6 (Del. June 10, 2021)).

[95]  2021 WL 2418984 (Del. June 10, 2021).

[96]  *Id.* at *6.

pattern of unkind behavior in communications with opposing counsel[97]—instructive.[98]   In *Hurley*, the Court found such was not prejudicial to the administration of justice under Professional Conduct Rule 8.4(d) because "the evidence did not clearly show that the letters, as offensive and inappropriate as they were, had an actual impact on the administration of justice."[99]  But the *Hurley* Court continued that the conduct there could be sanctionable "upon a showing that the conduct affected the performance of opposing counsel or had some other *distinct impact* on the judicial process."[100]  This language, the Court finds most instructive. A direct cause-effect type prejudice finding—which the State and Relator urge here must equate to mining their filings for signs of direct import of language or concept from privileged material—is not required.  The Court may sanction if it finds "the challenged conduct prejudices the fairness of the proceedings, such that it adversely affects the fair and efficient administration of justice"[101] or "adversely affect[s] the integrity of the proceeding"[102] in any consequential way.[103]

---

[97]   2018 WL 1319010, at *1-2 (Del. Mar. 14, 2018).

[98]   *Hunt,* 2021 WL 2418984, at *6.

[99]   2018 WL 1319010, at *3.

[100]   *Id.* (emphasis added); *see also Hunt*, 2021 WL 2418984, at *6 (wasting the court's "valuable time to address the sanctions request" is not enough to revoke *pro hac vice* counsel status).

[101]   *Infotechnology*, 582 A.2d at 216-17.

[102]   *Crumplar v. Superior Ct. ex rel. New Castle Cty.*, 56 A.3d 1000, 1010 (Del. 2012).

[103]   *Hunt,* 2021 WL 2418984, at *4-6.

**B. THE DECISION WHETHER TO DISQUALIFY RELATOR'S COUNSEL TURNS ON THE TOTALITY OF THE CIRCUMSTANCES.**

The standards just mentioned have been distilled from an array of scenarios addressing vastly different attorney conduct. Suffice it to say, this is not an instance of name-calling in letters or sending of pugnacious emails during litigation.[104] Nor is the Court asked to pass on an alleged conflict of interest arising from an attorney's prior-client representation or on her alleged misdeeds in other jurisdictions.[105] Here, after the action had already been commenced with the complaint's filing, counsel assisted a client in secreting a trove of materials—some trivial, some confidential or proprietary, some clearly covered by a recognized privilege, but all, no doubt, subject to another's clearly expressed privacy and ownership interest— from the opposing side. So, the Court turns to the treatment of similar behavior in like cases.

In a 2012 federal *qui tam* action, the United States District Court for the District of Arizona disqualified relator's counsel after finding counsel breached their "ethical duty to seek a ruling from the court about the privileged documents and breached their duty to contact [the defendant] about the documents after the

---

[104] *See Hurley*, 2018 WL 1319010, at *1; *Hunt,* 2021 WL 2418984, at *1.

[105] *E.g.*, *Infotechnology*, 582 A.2d at 216-17; *Page*, 2022 WL 162965, at *1.

-22-

complaint was unsealed."[106]  In that case, a relator copied and removed over 1,300

pages of his employer's documents, e-mails, and proprietary materials without

authorization and prior to leaving employment.[107]  In reviewing these documents,

relator's counsel came across various materials bearing indicia of attorney-client

privilege or attorney work-product information.[108]

After the complaint was unsealed, the defendant accused relator's counsel of

misappropriating confidential materials, violating their "ethical duties not to review,

retain, disclose, or use the privileged material that they had received from [relator,]"

and failing to either notify defendants when they received the privileged materials,

or at a minimum, seek guidance from the court.[109] Relator's counsel asserted that the

documents were not only set aside and placed into a sealed box, but none of them

were read or relied upon in preparing the complaint.[110]

The court was sensitive to the federal False Claims Act's provision requiring

a complaint to remain under seal and found that *qui tam* counsel's duty to notify is

not triggered until after the complaint is unsealed.[111]  But the court did, in the end,

---

[106] *United States ex rel. Frazier v. IASIS Healthcare Corp.*, 2012 WL 130332, at *15 (D. Ariz. Jan. 10, 2012).

[107] *Id.* at *3.

[108] *Id.* at *5.

[109] *Id.* at *13.

[110] *Id.* at *6-7.

[111] *Id.* at *15 ("Counsel will not be sanctioned for failing to inform [the defendant about the] potentially privileged documents before the Court unsealed the complaint.").

disqualify relator's counsel and awarded attorney's fees and costs related to recovering the privileged material.[112]

In another federal *qui tam* action, a court disqualified relators' counsel due to their actions both before and after exposure to the privileged materials.[113] There, the court was particularly persuaded by the following circumstances:

- Relators' counsel quoted privileged documents in pleadings and failed to take any "'reasonable remedial action,' such as consulting the court about what to do about privilege issues."[114]

- Counsel's argument that "disqualification is inappropriate where the client is the source of the privileged material" was unavailing because "[a]ttorneys are not free, under the standards for proper ethical conduct . . . to do whatever they want with the privileged documents they obtain from their clients."[115]

- The defendants were prejudiced by relators' counsel's "exposure" to the privileged materials because "counsel not only used privileged materials to craft their claims, but incorporated verbatim content from those materials in the pleadings."[116]

---

[112] *Id.* The court refused to dismiss the suit altogether noting "extraordinary circumstances of bad faith" were not shown, particularly since the privileged documents were stored in a sealed box and not relied upon by relator's counsel in drafting the complaint. *Id.*

[113] *United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 2013 WL 2278122, at *2-3 (C.D. Cal. May 20, 2013).

[114] *Id.* at *3.

[115] *Id.*

[116] *Id.* (citation omitted); *see also Clark v. Superior Court,* 125 Cal. Rptr. 3d 361, 374 (Cal. Ct. App. 2011) (finding evidence existed suggesting counsel used a privileged document to craft a claim, "which necessarily required an excessive review of [its] content . . . beyond what would be permissible to determine [whether] the memo was privileged").

- The motion to disqualify was not mere tactical delay as it was promptly filed and before any critical deadlines were due.[117]

- The privileged materials were transmitted by counsel to the government.[118] Additionally, where other courts have considered whether counsel disqualification is prudent, the "prejudice" inquiry has turned on "the significance and materiality of the privileged information to the underlying litigation. Access [alone] to inconsequential information does not support disqualification, but review of information material to the underlying litigation weighs in favor of disqualification."[119]

---

[117] *United States ex rel. Hartpence*, 2013 WL 2278122, at *3; *see also Maruman Integrated Cirs., Inc. v. Consortium Co.,* 212 Cal.Rptr.497, 451 (Cal. Ct. App. 1985) (explaining that "the court properly took into consideration the possibility that plaintiff brought the motion as a tactical device to delay the trial *when it was heard the day before the trial was to commence"* (emphasis added)).

[118] *United States ex rel. Hartpence*, 2013 WL 2278122, at *2-3.

[119] *In re Examination of Privilege Claims*, 2016 WL 11164791, at *5 (W.D. Wash. May 20, 2016) (citation omitted), *report and recommendation adopted* 2016 WL 8669870 (W.D. Wash. July 22, 2016); *see also Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 229, 235-36 (2d Cir. 1977) ) (disqualifying firm whose lawyers had a close "working relationship" with the disqualified attorney, thereby raising a presumption of "potentially improper disclosure" (citation omitted)); *Beltran v. Avon Prods.*, 867 F.Supp.2d 1068, 1084 (C.D. Cal. 2012) ("Even if the [law firm] did not, in fact, acquire confidential information, their involvement in the case would taint the appearance of probity and fairness of the proceedings." (citation omitted)); *Richards v. Jain*, 168 F.Supp.2d 1195, 1207-09 (W.D. Wash. 2001) (disqualification was warranted where law firm reviewed "almost a thousand privileged documents"—despite obvious privilege markings, failed to notify opposing counsel of its possession of the material, held the privileged material for eleven months, and unsuccessfully argued "no confidences were revealed to or used by the firm"); *Ackerman v. Nat'l Prop. Analysts, Inc.*, 887 F.Supp.510, 518-19 (S.D.N.Y. 1993) (disqualifying counsel and dismissing complaint prepared in reliance on improper disclosures by the opposing party's former counsel).

Against this backdrop then, what circumstances must the Court treat as dispositive? As an initial matter, a relator's counsel's "mere exposure" to privileged information alone might not warrant disqualification.[120] But access and exposure *do* require "reasonable remedial action,"[121] which could include: (1) building proper ethical walls or utilizing a privilege team;[122] (2) seeking immediate and appropriate court guidance,[123] and (3) prompt notification to opposing counsel once the complaint is unsealed.[124] None of that was done here.

## C. THE PRESENT CIRCUMSTANCES REQUIRE MR. FOX'S DISQUALIFICATION.

The decision to disqualify an attorney is not one the Court either takes lightly or relishes. But on balance, the totality of the circumstances weighs in favor of

---

[120] *See, e.g.*, *United States ex rel. Hartpence*, 2013 WL 2278122, at *3; *In re Examination of Privilege Claims*, 2016 WL 11164791, at *5. That said, counsel must avoid incorporating verbatim privileged content (or materials derived therefrom) into their pleadings and refrain from sharing the same with the government absent court guidance. *United States ex rel. Hartpence*, 2013 WL 2278122, at *2-3.

[121] *Gomez v. Vernon*, 255 F.3d 1118, 1134 (9th Cir. 2001).

[122] *State v. Robinson*, 209 A.3d 25, 58-60 (Del. 2019) (approving the use of a taint team to cure harm caused by prosecution's exposure to privileged material). In *State v. McGuiness*, this Court authorized the use of a filter team "to review privileged information and communications from the seized devices . . . [because] there was a concern that the laptops contained privileged and confidential information . . . ." 2022 WL 1580601, at *1 (Del. Super. Ct. May 18, 2022); *Dollar Tree, Inc.*, 2017 WL 5624298, at *2-7 (rejecting motion to disqualify counsel because law firm took "numerous" precautions including setting up an ethical screen when it realized the internal conflict).

[123] *Gomez*, 255 F.3d at 1135 (noting that "for counsel facing an ethical dilemma concerning privileged documents[,] [t]he path to ethical resolution is simple: when in doubt, ask the court").

[124] *United States ex rel. Frazier*, 2012 WL 130332, at *15; *see United States ex rel. Hartpence*, 2013 WL 2278122, at *2.

Mr. Fox's disqualification. No doubt, navigating the ethical snares present in the initial stages of a *qui tam* action is a tall task even for the most astute and experienced lawyer, who as one commentator has suggested must balance the "inconsistent or conflicting obligations to, and expectations of, [her] client, the court, [and/or] the government."[125]

Given the purpose of federal and state false claims acts there is some room in *qui tam* actions for covert behavior.[126] And courts in *qui tam* actions allow evidence that would likely be struck or precluded in other contexts.[127] But none of the general public policy considerations favoring tolerance of such at the initial or reporting stages could be viewed as licensing what occurred here. And Mr. Fox had any number of opportunities to course correct yet failed to do so.

In November 2018, on first review of the InComm laptop files, Mr. Fox discovered some were attorney-client documents.[128]

---

[125] *See* Clark, *supra* note 85.

[126] *See* DEL. CODE ANN., tit. 6 § 1203(b)(2) (2018) ("The complaint shall be filed in camera and shall remain under seal for at least 60 days.").

[127] For instance, a court may allow evidence that would otherwise violate a nondisclosure agreement. *United States ex rel. Ruhe Masimo Corp.*, 929 F.Supp.2d 1033, 1038-39 (C.D. Cal. 2012) (citing *United States v. Cancer Treatment Centers of Am.*, 350 F.Supp.2d 765, 773 (N.D. Ill. 2004)); *see also United States ex rel. Gohil v. Sanofi U.S. Servs. Inc.*, 2016 WL 9185141, at *2 n.3 (finding that "[e]ven if the documents were 'misappropriated,' [relator]'s actions would not necessarily warrant exclusion of using the documents . . . [as] [f]ederal courts recognize that there is a strong public policy to allow relators to use corporate documents from the defendant in the prosecution of FCA claims" (citing cases)).

[128] *See, e.g.*, InComm's Mot. for Disqualification and Reimbursement, Ex. BB (tagging Doc 17840 as "Attorney-Client").

At this point, Mr. Fox could have (1) set up an ethical wall, (2) contacted the Court as the sealed Complaint had already been filed, or (3) contacted Delaware counsel or the Department of Justice for advice. Instead, he chose to keep his knowledge quiet, continued reviewing InComm's documents, and did little-to-nothing to minimize or memorialize his actions.

At his next crossroad, on May 28, 2019, when the Complaint was unsealed, Mr. Fox could have informed opposing counsel that he had a large cache of InComm's materials which he knew InComm had asked all be returned before he copied them. He failed to do so. He instead waited until June 1, 2020, to first inform opposing counsel through an interrogatory response.[129]

Incanting time and again the single phrase from § 1203(b)(2) that a DFCRA relator should provide a "written disclosure of substantially all material evidence and information the private party possesses" to the Delaware Department of Justice when her complaint is filed, Bondurant and Mr. Fox insist the purloining of their opponent's documents and material, surreptitiously rummaging through them at will, and keeping their copy's existence quiet for over a year is justified. Not so.

---

[129] *State ex rel. Rogers,* 271 A.3d at 744; Stipulated Timeline at 2. Mr. Fox's alleged fail-safe was the use of a notepad which had the names of attorneys on it. That list is now missing. And Bondurant insists any detail concerning its construction cannot be disclosed because of work product privilege. *See* InComm's Mot. for Disqualification and Reimbursement, Ex. Q at 1-2; *id.*, Ex. P at 1; July 22, 2022 Status Conference Tr. at 80-81 (D.I. 295).

Litigating a *qui tam* action does not mean an attorney is allowed to ignore his regular duties to the Court and opposing counsel. Where Mr. Fox might not have had a duty to disclose the existence of the privileged documents to opposing counsel until the Complaint was unsealed, that did not give him license to fail to inform opposing counsel for nearly a year after the Complaint was unsealed and fail to take any safeguards of which there were many. This is especially true where—if uncertain how to proceed in that unusual circumstance—resources to guide him were quite literally a phone call, email, or *in camera* application away.

Moreover, what exactly Mr. Fox gleaned and incorporated from viewing those privileged documents can never be fully determined. Bondurant insisted that Mr. Fox "performed a targeted search to provide documents to the State of Delaware in compliance with Relator's obligations under" the Delaware False Claims Act.[130] The Special Master's Report demonstrates otherwise.[131] And not including verbatim

---

[130] *E.g.,* D.I. 182, Ex. F. at 1-2.

[131] Indeed, the interaction seemed far closer to that suggested by InComm:

> So after that initial review, Bondurant continued to periodically search the laptop with no restriction, did so on 16 occasions over the next year and a half. Ultimately looking as you can see at our summary of the numbers up on the screen here at 55 privileged documents, 21 of them were looked at more than once, 19 were tagged as either ask client or responsive, suggesting that some relevance to the case was registered. There were notes affixed to four of the privileged documents and in total there were 161 instances of engagement with InComm's privileged documents.

July 22, 2022 Status Conference Tr. at 9.

excerpts from privileged materials does not mean the information therefrom did not influence strategy or litigation conduct.

Two factors regarding his conduct weigh most heavily in favor of disqualification—Mr. Fox's failure to use remedial measures to ensure minimization of exposure or use of any potential privileged material, and Mr. Fox's failure to disclose Bondurant's possession of the privileged (as well as InComm's otherwise confidential or even irrelevant, but proprietary) material for more than a year after the Complaint was unsealed.  Mr. Fox's insistence that the privileged information was not used in the Complaint does not defeat disqualification because while the advantage from that information cannot be precisely determined, a precise determination is not necessary—in these circumstances, such conduct taints the fairness of this proceeding.

1. **Relator's Counsel Failed to Seek Court Guidance and Failed to Implement Remedial Measures When it was Readily Apparent He Possessed Privileged Materials.**

Bondurant took Relator's InComm-issued laptop and made a complete forensic copy thereof to aid in its prosecution of this then-already-initiated lawsuit. That forensic copy gave Bondurant and Mr. Fox unlimited access to 36,648 documents, including a series of backup files, Relator's InComm e-mail account, and InComm documents and materials.[132]

---

[132] *See* Special Master's Confidential Final Report at 4-5.

Though federal guidance says exposure alone isn't enough to warrant disqualification, surely Mr. Fox was acutely aware of the potential of privileged materials lurking among the tens of thousands of documents—especially considering the purpose he was given the laptop in the first instance. "[T]he framers of the [False Claims] Act recognized that wrongdoers might be rewarded under the Act, acknowledging the qui tam provisions are based upon the idea of setting a rogue to catch a rogue."[133] Nonetheless, Mr. Fox neglected to implement any ethical screen because he "did not believe" any privileged information "*relating to this action*" would be discovered given Relator's "operational roles" at InComm.[134]

What ultimately pushes Mr. Fox into disqualification territory, however, is his continued failure to implement remedial action *after* it became apparent he possessed InComm's privileged materials.

Generally, when a lawyer encounters his adversary's privileged materials, he should not review them "any more than is essential" to determine whether a claim of privilege exists.[135] Mr. Fox immediately should have walled off or sealed any of the documents he deemed "privileged" at first sight. Instead, it appears after

---

[133] *Mortgs., Inc. v. United States Dist. Ct. for the Dist. of Nev. (Las Vegas),* 934 F.2d 209, 213 (9th Cir. 1991) (citation and quotation marks omitted).

[134] Relator's Answering Br. in Opp'n at 7 (emphasis added) (citation omitted).

[135] *Clark*, 125 Cal. Rptr. 3d at 373 (citation omitted); *Gomez*, 255 F.3d at 1132 (finding counsel "should refrain from examining the materials, notify the sending lawyer and abide the instructions of the lawyer who sent them" (quoting ABA COMM. ON ETHICS AND PROF'L RESP., FORMAL OP. 368 (1992)).

"tagging" one document with the "Attorney-Client" label, he later accessed the same document three more times.[136] Similarly, he tagged an e-mail as "Attorney-Client" only to open another e-mail within the same thread and tag it "Responsive" and "Ask Client."[137]

Equally unavailing is Relator's counsel's argument that InComm "inflates the number of documents potentially at issue."[138] Counsel states that 37 of the 59 responsive privileged documents are "redlined mark-ups of contracts."[139] He also says some of those documents are duplicates, some include margin comments, one is a "legal memo," and the rest are e-mail threads.[140] In all, Mr. Fox characterizes the "full scope" of his review of InComm's privileged documents as brief at best and only comprised "(a) tracked changes in at most 12 draft agreements; (b) portions of 9 email threads; and (c) a single memorandum."[141] Such a detailed characterization of the documents he interacted with suggests an examination well beyond what is reasonably necessary to make a privilege determination. Distinguishing one clean

---

[136] InComm's Mot. for Disqualification and Reimbursement, Ex. BB (marking Doc 34016 as "Attorney-Client" but then revisiting document on multiple occasions); *see* July 22, 2022 Status Conference Tr. at 7-10.

[137] InComm's Mot. for Disqualification and Reimbursement, Ex. BB (marking Doc 17840 as "Attorney-Client" and marking Doc 29983 as "Responsive" and "Ask Client"); *id.*, Ex. KK (finding Doc 29983 to be part of the same thread as Doc 17840).

[138] Relator's Answering Br. in Opp'n at 14.

[139] *Id.*

[140] *Id.* at 15-16.

[141] *Id.* at 16.

document from its various "marked-up" version(s)—especially via the DISCO "viewer" that "pre-loads only 1 document at a time" as Mr. Fox purportedly did—no doubt requires more than a mere one-time skimming to make a privilege determination.[142]

At a minimum, Mr. Fox should have implemented *some* form of reasonable remedial or prophylactic measure to ensure the safeguarding of InComm's privileged materials. For example, (i) seeking the Court's guidance; (ii) creating "filters" or "search terms" within the DISCO database to exclude patently privileged documents, *e.g.*, those bearing labels of "attorney-client privilege" or "work-product privilege,"[143] (iii) implementing a locked-box equivalent[144] of sequestering the privileged materials; or (iv) employing a third-party vendor to conduct the initial document vetting to ensure the exclusion of any privileged material. Mr. Fox's

---

[142] *Id.* at 14.

[143] *See, e.g.*, *Sun Life Assurance Co. of Canada*, 2019 WL 6998156, at *3, *6 (disqualifying firm despite it instituting firmwide safeguards such as a "computer lock-out," segregating paper files, and implementing a firmwide ethics screen). That case settled on unrelated grounds and the Delaware Supreme Court vacated the disqualification, absolving the firm from any negative reputational effects from the trial court's decision. In part, the vacatur was influenced by this Court's determination that the "attorneys individually and the firm as a whole promptly demonstrated the vigilance appropriate to the profession, and undertook precisely those prophylactic actions necessary to safeguard the confidences of their current and past clients." *In re Appeal of Sun Life Assurance Co. of Canada*, 2021 WL 964894, at *2 n.9 (quoting *Sun Life Assurance Co. of Canada v. Wilm. Sav. Fund. Soc'y, FSB*, 2020 WL 1814758, at *6 (Del. Super. Ct. Apr. 9, 2020)).

[144] *United States ex rel. Frazier*, 2012 WL 130332, at *15 (holding no circumstances of bad faith present because "counsel kept the undisputed, privileged documents in a Sealed Box").

wholesale failure to take any of those steps falls well below that which the Court expects of counsel dealing with any third-parties' documents.

## 2. Relator's Counsel Failed to Promptly Notify InComm When It Was Readily Apparent He Possessed Privileged (and Other) Materials.

Almost one year after the Complaint was unsealed, InComm learned for the first time, via discovery responses, that Relator's counsel had a complete forensic copy of InComm's laptop.[145]

Even then, InComm didn't learn of the full breadth of Bondurant's interactions with its privileged materials until *after* the Special Master's Report was filed, two years after Bondurant penned a letter to InComm denying any exposure to privileged information,[146] and almost *three years* after the Complaint was unsealed.[147]

Bondurant argues there is no requirement counsel be notified that it has privileged material.[148] It cites two now-withdrawn ABA Opinions regarding Model

---

[145] InComm's Mot. for Disqualification and Reimbursement, Ex. A at 8 (Relator's Responses to First Set of Interrogatories, June 1, 2020) ("Relator further responds that, after the action was filed and Relator became aware that he was being terminated from his position with Defendant ICI, a digital copy of the emails and other files he had previously saved to his laptop was made to preserve potential evidence of Defendants' scheme from destruction or erasure following Relator's return of the device to ICI.").

[146] *Id.*, Ex. G at 2 (Bondurant's September 4, 2020 Letter to InComm) ("[N]o privileged information was reviewed or identified during this process.").

[147] The Special Master's Report was filed January 7, 2022. D.I. 247. The Complaint was filed September 28, 2018. D.I. 1. And the Complaint was unsealed May 28, 2019. Stipulated Timeline at 2.

[148] Relator's Suppl. Letter at 10-11.

Rule 4.4(b)—which Delaware adopted—and concludes that because the Opinions were withdrawn, they "no longer reflect[] the requirements of ethical conduct."[149]

True, Bondurant did not receive the privileged material through inadvertent disclosure as contemplated by Rule 4.4. But under Delaware case law, disclosure is still required.[150] In *Postorivo v. AG Paintball Holdings, Inc.*, the Court of Chancery found that even though privileged documents were rightfully possessed, under "reasoning analogous[] to the inadvertent production situation addressed in Rule 4.4(b)," the attorneys "had a duty, at least, to notify counsel for the [plaintiffs] about the documents, *so that they could take protective measures*."[151] The *Postorivo* court's reasoning was explicit and applies with equal weight here. Explicit notification was required at the earliest practicable instance so InComm could take protective measures from the breaches of its privileged material.

Bondurant attempts its last defense by arguing that no actual prejudice occurred and therefore disqualification is inappropriate.[152]

---

[149] *Id.*

[150] *Postorivo*, 2008 WL 3876199, at *18.

[151] *Id.* (emphasis added).

[152] Relator's Suppl. Letter at 6-8, 11-12. Bondurant also argues the source of the information is significant, *i.e.*, whether it was from a party or non-party. *Id.* at 7. But that distinction is of no concern. In *Postorivo v. AG Paintball Holdings, Inc.*, the Court of Chancery disqualified two attorneys finding: "it is more likely than not that Scheff and Ziegler were exposed to privileged client confidences . . . allowing them to continue as trial counsel *would create a risk of the release or use of confidential privileged information* of NPS and Postorivo." 2008 WL 3876199, *23 (emphasis added). So it was not the source of the information that concerned the Court of Chancery, it was the risk of its use.

Bondurant's assurances that no "privileged information was publicly disclosed, shared with others, or even used in the litigation,"[153] may very well be true, but a requirement of proof of "actual use" for disqualification in these circumstances would be impractical. What's more, those assurances are no license to usurp ethical obligations or engage in dilatory discovery practices. Bondurant's surreptitious and protracted access to InComm's privileged materials, coupled with its failure to adequately and promptly notify InComm of its possession of the same, casts "a substantial taint on any future proceedings."[154]

It is impossible to fully know how the information gleaned was used. Even if it does not appear in the Complaint, that does not mean it did not contribute to strategy. Such an unfair advantage taints the proceedings.

### 3. The Totality of the Circumstances Warrants Disqualification.

Mr. Fox's attempted detailed reconstruction of what privileged documents he did review significantly undermines his assertion that the exposure was brief or limited.[155] It's a far cry to suggest InComm were adequately and promptly notified

---

[153] Relator's Answering Br. in Opp'n at 37 (citation omitted); *see also* Relator's Suppl. Letter at 8 ("Even if Mr. Fox had read privileged information, limited exposure to privileged information is a common occurrence in modern civil litigation. And such limited exposure does not necessarily provide a reason for disqualification.").

[154] *See Richards*, 168 F.Supp.2d at 1207-09 (disqualification was warranted despite counsel's assurances that confidences weren't revealed or used by the firm); *see also Postorivo*, 2008 WL 3876199, at *16 ("Under DLRPC R. 4.4(b), a lawyer who knows or reasonably should know he received a document inadvertently has an affirmative duty to promptly notify the sender.").

[155] *See* Relator's Answering Br. in Opp'n at 14-16.

of Bondurant's possession of its materials—some of which were privileged; all of which it had an expressed ownership interest in. Instead, much ink was spilled, many hours were billed, and a pandemic came and went before InComm became fully informed of Bondurant's exposure to its privileged materials. This all could have been avoided with the Court's guidance or by leaving sharp litigation practices at the door. And here those practices, taken as a whole, violated the professional norm required of counsel in Delaware courts.[156]

The State, Relator, and Bondurant all suggest that even if there was a lapse, there is insufficient prejudice shown. The Court cannot agree. While there may not be the obvious references to privileged documents in pleadings, there still appears to the Court some troubling links between strategies employed or inquiries made and the privileged materials reviewed. As an example, InComm cites to certain of Bondurant's third-party deposition requests made after Mr. Fox read the privileged attorney advice given to InComm while negotiating certain contracts with those third parties.[157] Any potential contamination of future tactical decisions or filings must be stemmed now.

---

[156] *See, e.g.,* Del. Lawyers' R. of Prof'l Conduct 4.4 (Respect for rights of third parties) cmt. 1 ("Responsibility to a client requires a lawyer to subordinate the interests of others to those of the client, but that responsibility does not imply that a lawyer may disregard the rights of third persons. *It is impractical to catalogue all such rights, but they include legal restrictions on methods of obtaining evidence from third persons and unwarranted intrusions into privileged relationships, such as the client-lawyer relationship.*" (emphasis added)).

[157] *E.g.*, Status Conference Tr. at 17-19.

In sum, the Court finds clear and convincing evidence that Mr. Fox's specific actions in relation to the InComm laptop materials and his continued participation in this matter will adversely affect the integrity of the proceedings in this case. And because a court "must not hesitate to disqualify an attorney when it is satisfactorily established that he or she wrongfully acquired an unfair advantage that undermines the integrity of the judicial process and will have a continuing effect on the proceedings,"[158] the Court must do so here.

Accordingly, disqualification of Mr. Fox as counsel for Relator is warranted and InComm's motion therefor is **GRANTED**.

**D. DISQUALIFICATION OF THE BONDURANT LAW FIRM IS NOT WARRANTED.**

While vicarious disqualification is often discussed in the conflict-of-interest context,[159] courts can and have disqualified law firms because other actions by their attorneys have tainted the entire firm.[160] In a 2016 federal district court case, the court disqualified an attorney and went on to disqualify the entire firm after finding that because of its "small size" and because other attorneys were likely aware of the "alleged impropriety," disqualification was warranted.[161]

---

[158] *Gregori v. Bank of Am.*, 254 Cal. Rptr. 853, 858-59 (Cal. Ct. App. 1989).

[159] *See* Del. Lawyers' R. of Prof'l Conduct 1.10.

[160] *Bona Fide Conglomerate, Inc. v. Sourceamerica*, 2016 WL 4361808, at *12 (S.D. Cal. Aug. 16, 2016); *see, e.g., Gotham City Online*, 2014 WL 1025120, at *3; *Clark*, 125 Cal. Rptr. 3d 361 at 374-76.

[161] *Bona Fide Conglomerate, Inc.*, 2016 WL 4361808, at *12.

Here, the Special Master's Report concluded that Mr. Fox was the only attorney who accessed the privileged information.[162] And while "Bondurant paralegals prepared the production to the State," Bondurant insists they "conducted no substantive review."[163] The Court accepts Bondurant at its word.

The Court is reticent to disqualify the entire Bondurant law firm on the record before it.[164] While it is clear Mr. Fox's participation must end because of his interaction with the InComm laptop materials, the Court is not convinced that others at the firm, specifically attorneys, were tainted.

Accordingly, disqualification of Bondurant, Mixson & Elmore LLP is not warranted, and that motion is **DENIED**.

### E. DISQUALIFYING MR. FOX WILL NOT CAUSE PREJUDICE.

Finally, in considering Relator's right to the counsel of his choice, the disqualification of Mr. Fox will not occasion prejudice.[165] For one, the State of

---

[162] Special Master's Confidential Final Report at 6-7.

[163] Relator's Answering Br. in Opp'n at 7 n.23 (citation omitted).

[164] Bondurant, Mixson & Elmore LLP has nearly three dozen attorneys, which appears to be substantially more than those employed at the law firm disqualified in *Bona Fide Conglomerate, Inc. v. Sourceamerica*. 2016 WL 4361808, at *12; *Lawyers*, BONDURANT, MIXSON & ELMORE LLP, https://www.bmelaw.com/lawyers.html.

[165] *Avacus P'rs, L.P. v. Brian,* 1990 WL 27538, at *4 n.7 (Del. Ch. Mar. 9, 1990); *see also Gotham City Online, LLC*, 2014 WL 1025120, at *2 ("a court must balance such varied interests as a party's right to chosen counsel, the interest in representing a client, the burden placed on a client to find new counsel, and the possibility that tactical abuse underlies the disqualification motion" (citation and quotation marks omitted)).

Delaware, the real party in interest, has already intervened.[166]  Both parties have acknowledged that Mr. Fox did not provide,[167] and the State does not purport to have received,[168] any of the privileged documents at issue.  Too, Mr. Fox's removal from the remainder of these proceedings neither precludes nor prohibits Relator from continuing his attorney-client relationship with Bondurant and Delaware counsel.

## F.  REQUEST FOR REIMBURSEMENT OF FEES.

Delaware follows the "American Rule" with respect to fee-shifting in litigation, which requires each party to pay his or her own fees absent express statutory language to the contrary.[169]  Our courts have "accepted bad faith conduct of a party to the litigation as a valid exception to the American Rule.  Although there is no single definition of bad faith conduct, courts have found bad faith where parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."[170]

---

[166] State's Answering Br. in Opp'n at 1 ("After completing its investigation of the . . . factual allegations and legal contentions made in the complaint, the State intervened in May of 2019."); *see also State ex rel. Higgins v. SourceGas, LLC*, 2012 WL 1721783, at *4 (Del. Super. Ct. May 15, 2012) ("Should a private party institute a DFCRA action, as here, the Attorney General may intervene and proceed with the action if a determination is made that there is substantial evidence of a violation." (citation omitted))

[167] Relator's Answering Br. in Opp'n at 9.

[168] State's Answering Br. in Opp'n at 2 n.8 ("The State understands now that these documents came from the laptop image, and further understands that, at least for now, nobody is quarrelling over the State receiving these documents.").

[169] *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545 (Del. 1998).

[170] *Id.* at 546 (internal citations omitted).

Though Bondurant could have prophylactically done more to avoid reaching this point in the litigation, its decisions do not rise to the level of bad faith warranting wholesale fee-shifting. For one, the firm did not have the benefit of a bright line rule addressing what, if any, prophylactic measures *qui tam* counsel should take when dropped in the odd set of factual and procedural circumstances he faced when the InComm laptop *first* came to him. But once that laptop was cracked open, the firm and its lawyers' obligations became much clearer.[171]

Mr. Fox's professional biography on the firm's website touts over two decades' worth of experience in *qui tam* and whistleblower litigation.[172] So, on the one hand, upon seeing these privileged materials, he *should have known*, at a minimum, the immediate need for an ethical screen was paramount. That said, after viewing the files, and determining whether any were privileged and/or immaterial, no document subject to a claim of privilege was directly included in the pleadings or provided to the State.

Unfortunately, because of Mr. Fox and Bondurant's failing to expeditiously and properly report their secreting of more than 36,000 InComm files, and their

---

[171] *See* July 22, 2022 Status Conference Tr. at 7 (InComm counsel noting: "[O]n November the 20th, the very first time that Bondurant—the very first day that Bondurant was reviewing any of these documents, it came across nine privileged documents, including a memo from a law firm about [] analyzing various escheat issues[:] [A] [m]emo on law firm letterhead providing InComm's counsel advice on escheat issues.").

[172] *See* Benjamin E. Fox, BONDURANT, MIXSON & ELMORE, LLP, https://www.bmelaw.com/lawyers-Ben_Fox.html.

failing to adequately document their interactions with those files, the Court and parties have had to endure this long discovery detour.

The Court may shift a special discovery master's fees when justified by the conduct of a party.[173] Indeed, "Rule 37 gives the Court broad discretion to impose sanctions and shift costs for discovery violations."[174] The Court, however, must exercise care when imposing any sanction. Any sanction must always be tailored to the violation and its cure. And, as the Court recently observed, the ultimate decision on such "should always be viewed in light of the proper functions that sanctions are intended to serve."[175]

Here, Mr. Fox and Bondurant's conduct created the need for the Special Master's investigation. It was not the conduct of InComm and so it should not, and will not, shoulder the specific costs for that resource to determine the specific interaction of opposing counsel with its materials. Accordingly, Bondurant is ordered to pay the fees for Special Master Levine's investigation of the InComm laptop.

---

[173] *Dynacorp, et al. v. Underwriters at Lloyd's, London, et al.*, 2014 WL 4656393, at *2 (Del. Super. Ct. Sept. 18, 2014) (partially granting discovery master fee shifting for untimely production without justification).

[174] *Id.* at *3 (citations omitted); *see Pencader Assocs., Inc. v. Glasgow Tr.*, 446 A.2d 1097, 1101 (Del. 1982) ("Imposing sanctions in discovery matters lies within the discretion of the Trial Court." (citation omitted)).

[175] *Suburban Med. Servs. v. Brinton Manor Center*, 2022 WL 17688194, at *5 (Del. Super. Ct. Dec. 15, 2022) (cleaned up).

The uncommon question presented here "required significant work by both sides to fully present the arguments" and the Court finds no bad faith in the actions or arguments of either in addressing this specific disqualification issue.[176] As disqualification of Mr. Fox is already an extreme—but warranted—sanction to protect the integrity of the remainder of these proceedings, an award of attorney's fees is neither necessary nor just. But payment of the Special Master's fees incurred to investigate and report Mr. Fox and Bondurant's interaction with the InComm materials is warranted.

Thus, InComm's request for reimbursement of fees and costs associated with the Special Master and the instant motion is **GRANTED, in part**, and **DENIED, in part**.

## V. CONCLUSION

Defendant InComm's Motion to Disqualify Mr. Fox is **GRANTED** and the Court's previous order granting his admission *pro hac vice* (D.I. 57) is **REVOKED**. Should Relator designate any alternate counsel, he or she shall immediately file a declaration that he or she hasn't reviewed or received any information about the privileged InComm documents' contents. Relatedly, Mr. Fox shall neither discuss the contents of the privileged documents nor provide his work product to new or remaining counsel.

---

[176] *Nat'l Grange Mut. Ins. Co. v. Elegant Slumming, Inc.*, 59 A.3d 928, 933 (Del. 2013).

Defendant InComm's Motion to Disqualify Bondurant, Mixson & Elmore LLP is **DENIED**.

And, given the unique nature of the disqualification issue presented and the investigation required, Defendant InComm's Request for Reimbursement of Fees is **DENIED** as to attorney's fees and other costs, but **GRANTED** only as to Special Master Levine's fees.

**IT IS SO ORDERED.**

_____

Paul R. Wallace, Judge